1  Meryl Macklin (CA Bar No. 115053)
   Thomas Kerr (CA Bar No. 241530)
2  HOLME ROBERTS & OWEN LLP
3  560 Mission St.
   25th Floor
4  San Francisco, CA  94105
   Telephone:  (415) 268-2000
5  Facsimile:   (415) 268-1999
6  Email:  meryl.macklin@hro.com/tom.kerr@hro.com

7  Attorneys for Defendants
   CLAIMETRICS MANAGEMENT LLC, and
8  HALLMARK NATIONAL LLC

9

10              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
11                SAN FRANCISCO DIVISION

12

13  BARRY D. BLOOM, an individual,            CASE NO. C 08-02155-MHP

14                    Plaintiff,               Honorable Marilyn H. Patel

15       v.                                    **ANSWER, AFFIRMATIVE DEFENSES**
                                               **AND COUNTERCLAIMS**
16  CLAIMETRICS MANAGEMENT LLC, a
    Nevada limited liability company; HALLMARK
17  NATIONAL LLC, a Nevada limited liability
    company; and DOES 1 through 20, inclusive,
18
19                    Defendants.

20  CLAIMETRICS MANAGEMENT LLC, a
    Nevada limited liability company; HALLMARK
21  NATIONAL LLC, a Nevada limited liability
    company; and DOES 1 through 20, inclusive,
22
                      Counterclaimants,
23
24       v.

25  BARRY D. BLOOM, an individual,

26                    Counter defendant.

27

28

ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS
Case No. C 08-02155-MHP
#36888 v1

1    Defendants and Counterclaimants Claimetrics Management LLC ("Claimetrics

2  Management") and Hallmark National LLC  ("Hallmark National") (collectively "Defendants"),

3  answer the complaint (the "Complaint"), of Plaintiff Barry D. Bloom ("Plaintiff"), and assert

4  counterclaims as follows:

5                                    **ANSWER**

6    1.    Defendants lack knowledge or information sufficient to form a belief as to the truth of

7  the allegations in paragraph 1 and on that basis deny them.

8    2.    Defendants admit that Claimetrics Management is a limited liability company

9  organized under the laws of the State of Nevada, and that it is licensed to do business in California.

10 Defendants further admit that Hallmark National LLC changed its name to Claimetrics Management,

11 LLC in April, 2007.  Defendants deny the remaining allegations in Paragraph 2.

12   3.    Defendants admit that Hallmark National, now known as Claimetrics Management,

13 was a limited liability company organized under the laws of the State of Nevada and that Claimetrics

14 Management is the same company as that formerly known as Hallmark National.  Defendants deny

15 the remaining allegations in Paragraph 3.

16   4.    Defendants lack knowledge or information sufficient to form a belief as to the truth of

17 the allegations in Paragraph 4 of the Complaint, and on that basis deny them.

18   5.    Defendants lack knowledge or information sufficient to form a belief as to the truth of

19 the allegations in Paragraph 5 of the Complaint, and on that basis deny them.

20   6.    Defendants admit the allegations in Paragraph 6 of the Complaint.

21   7.    Defendants admit that Plaintiff became a Member of Hallmark National, that

22 Claimetrics Management was formerly known as Hallmark National, and that as of April 21, 2006,

23 the effective date of the Hallmark National LLC Operating Agreement, Plaintiff owned 20,000 Delta

24 units of Hallmark National, representing a percentage interest of 21.27%.  Defendants deny the

25 remaining allegations in Paragraph 7.

26   8.    Defendants admit that Hallmark National entered into an "Executive Employment

27 Agreement" with Plaintiff, dated April 24, 2006 (the "Employment Agreement").  Defendants

28

1

ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS
Case No. C 08-02155-MHP
#36888 v1

1  further state that the Employment Agreement speaks for itself and deny the allegations in Paragraph

2  8 to the extent inconsistent with the Employment Agreement.

3      9.      Defendants admit that on November 6, 2007, Claimetrics terminated Plaintiff's

4  employment with Claimetrics, and sent him a document dated November 6, 2007, entitled "Notice of

5  Termination of Employment Agreement," executed by Marshall Snipes and Tom Richards.

6  Defendants deny the remaining allegations in Paragraph 9.

7      10.     Defendants admit that on or about November 13, 2007, Plaintiff purported to provide

8  notice to defendants of their alleged breach of a material term or provision of the contract.

9  Defendants deny the remaining allegations in Paragraph 10 of the Complaint.

10                          **FIRST CAUSE OF ACTION**

11                              **(Breach of Contract)**

12     11.     Defendants incorporate their answers to Paragraphs 1 through 10, inclusive, as if each

13  were fully set forth below.

14     12.     Defendants state that the Employment Agreement and the Operating Agreement

15  speak for themselves and deny the allegations in Paragraph 12 of the Complaint to the extent

16  inconsistent with those Agreements.

17     13.     Defendants deny the allegations in Paragraph 13 of the Complaint.

18     14.     Defendants deny the allegations in Paragraph 14 of the Complaint.

19     15.     Defendants deny the allegations in Paragraph 15 of the Complaint.

20                          **SECOND CAUSE OF ACTION**

21                      **(Fraud-Intentional Misrepresentation)**

22     16.     Defendants incorporate their answers to Paragraphs 1 through 10, inclusive, as if each

23  were fully set forth below.

24     17.     Defendants deny the allegations in Paragraph 17 of the Complaint.

25     18.     Defendants deny the allegations in Paragraph 18 of the Complaint.

26     19.     Defendants deny the allegations in Paragraph 19 of the Complaint.

27     20.     Defendants deny the allegations in Paragraph 20 of the Complaint.

28     21.     Defendants deny the allegations in Paragraph 21 of the Complaint.

2

1  22.  Defendants deny the allegations in Paragraph 22 of the Complaint.

2  ### ANSWERING THE PRAYER FOR RELIEF

3  23.  Defendants deny the allegations set forth in the prayer for relief of the Complaint, and

4  deny that Plaintiff is entitled to the relief requested therein.

5  ### AFFIRMATIVE DEFENSES

6  As for separate affirmative defenses, Defendants allege as follows:

7  ### First Affirmative Defense

8  ### (Failure to State a Claim)

9  24.  The Complaint, and each and every claim alleged therein, fails to state facts sufficient

10  to constitute a claim upon which relief may be granted.

11  ### Second Affirmative Defense

12  ### (Unclean Hands)

13  25.  The Complaint, and each and every claim alleged therein, is barred by the doctrine of

14  unclean hands.

15  ### Third Affirmative Defense

16  ### (Equitable Estoppel)

17  26.  The Complaint, and each and every claim alleged therein, is barred by the doctrine of

18  equitable estoppel.

19  ### Fourth Affirmative Defense

20  ### (Failure of Condition)

21  27.  Defendants' performance is excused by the failure of a condition precedent to

22  Defendants' performance.

23  ### Fifth Affirmative Defense

24  ### (Modification of Contract)

25  28.  The Complaint, and each and every claim alleged therein, is barred as a result of oral

26  and written modifications to the contract at issue, and accordingly, the original contract cannot form

27  the basis for liability, nor can the modified contract.

28  ///

3

ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS
Case No. C 08-02155-MHP
#36888 v1

1

### Sixth Affirmative Defense

2

### (Failure to Mitigate)

3       29.    The Complaint, and each and every claim alleged therein, is barred, in whole or in

4    part, because Plaintiff failed to mitigate his damages.

5

### Seventh Affirmative Defense

6

### (Material Breach)

7       30.    Defendants' performance is excused by Plaintiff's material breach of the terms of the

8    contract.

9

### COUNTERCLAIMS

10      Defendants and Counterclaimants Claimetrics Management LLC ("Claimetrics"), formerly

11   known as Hallmark National LLC ("Hallmark National") (collectively "Defendants"), allege as

12   follows:

13

### PARTIES

14      31.    Claimetrics Management LLC is a Nevada Limited Liability Company with its

15   principal place of business in Oklahoma City, Oklahoma.

16      32.    Hallmark National LLC, now known as Claimetrics Management LLC, is a Nevada

17   Limited Liability Company with its principal place of business in Oklahoma City, Oklahoma.

18   Claimetrics has succeeded to all claims at one time held by Hallmark National relating to the facts

19   herein.

20      33.    On information and belief, Barry D. Bloom ("Plaintiff"), is an individual residing in

21   the County of San Mateo, California.

22

### JURISDICTION AND VENUE

23      34.    This Court has original jurisdiction over this Counterclaim pursuant to 28 U.S.C.

24   section 1332, because the parties are of diverse citizenship.

25      35.    Venue is proper in this district because Plaintiff resides in this district, and this case

26   was removed from California state court within this district and division.

27

### PRELIMINARY ALLEGATIONS

28

4

1    36.    Defendants are in the business of claims management for workers compensation and

2    other lines of insurance claims.  Until early 2006, Hallmark National was exclusively engaged in the

3    business of servicing claims for a related company, Express Personnel Services.  In early 2006, in

4    the interest of expanding its business to service other customers, and ultimately, to manage claims

5    for and service lines of insurance other than workers compensation, such as disability or liability

6    insurance, Defendants began negotiations with Plaintiff for the position of President and Chief

7    Operating Officer of Hallmark National.

8    37.    Defendants made clear to Plaintiff that they were interested in securing for Hallmark

9    National an experienced, knowledgeable, competent, and visionary chief operating executive officer,

10   who could accomplish for Hallmark National such things as bringing new customers to Hallmark

11   National; hiring other senior executives with industry sales experience and vision; implementing a

12   new computer system for Hallmark, which was critical to its success in accordance with its strategic

13   objectives, as the existing system could not manage the additional lines of insurance; and managing

14   expenditures for a company that would be, as a result of the strategic change in its direction

15   essentially, a start-up operation.  Plaintiff represented to Hallmark National that he had relevant

16   industry experience, knew people who could serve as senior executives reporting to him, and that he

17   could accomplish Hallmark National's strategic objectives, including securing certain customers for

18   Hallmark National.

19   38.    Accordingly, effective April 24, 2006, Hallmark National entered into a written

20   agreement with Plaintiff entitled "Executive Employment Agreement" ("Employment Agreement").

21   The Employment Agreement provided, among other things, that Plaintiff "has the normal duties,

22   responsibilities and authority of the President and Chief Operating Officer and will perform such

23   services as the Company or the Chief Executive Officer from time to time directs, consistent with

24   the policies established from time to time by the Board of Managers of the Company."  See Exhibit

25   A (Executive Employment Agreement), ¶ 3.1.  During the negotiations, the parties discussed and

26   agreed upon Plaintiff's "duties, responsibilities and authority" and Hallmark National made clear to

27   Plaintiff its expectations for Plaintiff's performance in his job as President and Chief Operating

28   Officer, as outlined above.

5

39.     During the course of Plaintiff's employment with Defendants, Plaintiff consistently failed to satisfy the duties and responsibilities or to perform the services required by Defendants, as specified in their negotiations with Plaintiff or the additional duties, responsibilities, and services that Defendants specifically requested Plaintiff to perform during the course of his employment. Plaintiff's complete failure to perform in the role of chief operating officer and president included, but is not limited to, the following:  (a) pursuing a flawed business model including limiting sales targets to clients which proved to be untenable, hiring senior executives located around the country, working from their homes, and only occasionally meeting in person, whose responsibilities included developing lines of business that Defendants were not yet prepared to engage in; (b) antagonizing members of his executive and administrative staff through an abrasive and abusive management style, including discriminatory comments, resulting in a serious morale problem detracting from productivity; (c) failing to bring in any new business, including customers promised by Plaintiff to Defendants before the Employement Agreement was signed; (d) making and approving excessive expenditures for such things as personal business travel and entertainment and company marketing activities; (e) failing to implement an updated software system that was necessary to the operations of Defendants' business and wasting money on one system that proved inadequate, necessitating the purchase of a second system, all in less than eighteen months' time.

40.     Accordingly, on November 6, 2007, Claimetrics terminated Plaintiff's employment with cause, as provided for in the Paragraph 8.2 of the Employment Agreement.  See Exhibit A, ¶ 8.2.

41.     As a result of Plaintiff's actions, Defendants were left with a company with no new customers, and an $8 million deficit.  In addition, Defendants have been forced to release other employees, including senior executives, two of whom have to date either sued or threatened suit against Defendants.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

42.     Defendants incorporate by reference Paragraphs 31-41 of this Counterclaim as though fully set forth herein.

6

1    43.    Defendants and Plaintiff entered into a written contract, the Employment Agreement,

2  which provided that Plaintiff would "perform such services as the Company or the Chief Executive

3  Officer from time to time directs, consistent with the policies established from time to timeby the

4  Board of Managers of the Company."  See Exhibit A (Executive Employment Agreement), ¶ 3.1.

5  As outlined in Paragraph 37 above, Defendants made clear to Plaintiff at the time the Employment

6  Agreement was negotiated and signed, what services they expected Plaintiff to perform.

7    44.    Defendants performed all covenants, conditions and promises on their part of the

8  Employment Agreement, except those that Defendants were prevented from performing as a result

9  of Plaintiff's breach.

10    45.    Plaintiff breached the Employment Agreement, by among things, failing to perform

11  the services that Defendants directed, or to carry out the duties and responsibilities established by

12  Defendants, as set forth above.

13    46.    As a result of Plaintiff's breach of the Employment Agreement, Defendants have

14  incurred, and are continuing to incur damages, for which Plaintiff is liable.

15                                  **SECOND CAUSE OF ACTION**

16                **(Breach of Implied Covenant of Good Faith and Fair Dealing)**

17    47.    Defendants incorporate by reference Paragraphs 31-41 of this Counterclaim as though

18  fully set forth herein.

19    48.    Plaintiff and Defendants entered into a written contract: the Employment Agreement.

20    49.    There is implied in every contract a covenant of good faith and fair dealing, which

21  obligates the parties to the agreement to act in good faith so as not to deny the benefits of the

22  agreement to the other party.

23    50.    Plaintiff has breached the implied covenant of good faith and fair dealing by failing to

24  act fairly and with good faith in performing his obligations under the Employment Agreement.

25    51.    As a result of Plaintiff's breach of the implied convenant of good faith and fair

26  dealing, Defendants have incurred, and are continuing to incur damages, for which Plaintiff is liable.

27  ///

28  ///

7

ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS
Case No. C 08-02155-MHP
#36888 v1

## THIRD CAUSE OF ACTION

### (Promissory Estoppel)

52.     Defendants incorporate by reference Paragraphs 31-41 of this Counterclaim as though fully set forth herein.

53.     In the course of the employment negotiations between Defendants and Plaintiff, and throughout Plaintiff's employment with Defendants, Plaintiff promised that he would perform the duties and responsibilities of a chief operating officer and president of Hallmark National as outlined above.

54.     In the course of his employment with Defendants, Plaintiff failed to perform the duties and responsibilities of a chief operating officer and president of Hallmark National as outlined above.

55.     Defendants relied on Plaintiff's promises by offering Plaintiff employment with Defendants based on his promises, and by continuing Plaintiff's employment with Defendants based on Plaintiff's continued promises to Defendants.

56.     Defendants' reliance on Plaintiff's promises was reasonable and foreseeable to Plaintiff, because Plaintiff knew that the promises were a primary reason for his being considered for employment by Defendants.

57.     As a result of Plaintiff's breach of his promises to Defendants, Defendants have incurred, and are continuing to incur damages, for which Plaintiff is liable.

## FOURTH CAUSE OF ACTION

### (Breach of Fiduciary Duty)

58.     Defendants incorporate by reference Paragraphs 31-41 of this Counterclaim as though fully set forth herein.

59.     As the President and Chief Operating Officer of Defendants, Plaintiff owed Defendants a fiduciary duty to act with the utmost good faith in the best interests of Defendants, including the duties of care, loyalty, honesty, and disclosure.

60.     Plaintiff breached his fiduciary duty to Defendants by, at a minimum, the acts alleged above in Paragraph 39.

8

ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS
Case No. C 08-02155-MHP
#36888 v1

1    61.    As a result of Plaintiff's breach of his fiduciary duty to Defendants, Defendants have

2    incurred, and are continuing to incur damages, for which Plaintiff is liable.

3                                    **PRAYER FOR RELIEF**

4        WHEREFORE, Defendants pray for relief on their Counterclaims as follows:

5        1.    For judgment in their favor and against Plaintiff for damages in an amount to be

6    proved at trial;

7        2.    For interest thereon;

8        3.    For their reasonable costs and expenses of suit; and

9        4.    For such further relief as the Court deems proper.

10

11    Dated: May 2, 2008                    HOLME ROBERTS & OWEN LLP

12

13                                          By:

14                                              Meryl Macklin

15                                          Attorneys for Defendants and Counterclaimants
                                            CLAIMETRICS MANAGEMENT LLC and
16                                          HALLMARK NATIONAL LLC

17

18

19

20

21

22

23

24

25

26

27

28

                                            9

# **EXHIBIT A**

<u>EXECUTIVE EMPLOYMENT AGREEMENT</u>

This EXECUTIVE EMPLOYMENT AGREEMENT ("Agreement") is made effective as of the ____ day of _____, 2006, by and between Hallmark National LLC, a Nevada limited liability company (the "Company"), and Barry D. Bloom (the "Executive").

## WITNESSETH:

WHEREAS, the Company entered into an employment arrangement with Executive as of April 24, 2006 upon the terms and conditions set forth in this Agreement; and

WHEREAS, the Company and the Executive desires to memorialize the terms and conditions of the employment arrangement by executing this Agreement;

WHEREAS, the Executive desires to be so employed upon such terms and conditions;

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties agree as follows:

1.    <u>Employment</u>.  Subject to the terms and conditions of this Agreement, the Company hereby employs the Executive, and the Executive hereby accepts employment with the Company to serve as the Company's President and Chief Operating Officer.

2.    <u>Term of Employment</u>.  The term of this Agreement shall commence on April 24, 2006 (the "Commencement Date") and shall continue until 5:00 p.m. Oklahoma City time on April 30, 2009 (the "Expiration Date"), unless sooner terminated as provided in Section 8.

3.    <u>Duties and Responsibilities</u>.

3.1    <u>As President and the Chief Operating Officer of the Company</u>.  The Executive shall serve as the President and Chief Operating Officer of the Company.  In that capacity, he has the normal duties, responsibilities and authority of the President and the Chief Operating Officer and will perform such services as the Company or the Chief Executive Officer from time to time directs, consistent with the policies established from time to time by the Board of Managers of the Company. The Company shall provide to the Executive adequate office facilities, staff and reporting relationships commensurate with his position to enable him to perform his duties hereunder.  The Executive's office shall be in California at a location selected by the Executive, subject to travel necessary for the performance of his duties hereunder.

3.2    <u>Extent of Services</u>.  The Executive shall report to the Chief Executive Officer of the Company and the Board of Managers, and Executive shall devote his best efforts and full business time and attention (except for permitted vacation periods and reasonable periods of illness or other capacity) to the Business and affairs of the Company.  Executive shall perform his duties and responsibilities to the best of his abilities in a diligent, trustworthy, businesslike and efficient manner.

4. <u>Compensation.</u>

   **4.1** <u>Base Salary</u>. The Company shall pay to the Executive for the services to be rendered by the Executive hereunder a base salary of $300,000 per year (the "Base Salary"). The Base Salary shall be payable in equal installments (subject to withholding tax) in accordance with the Company's regular payroll schedule.

   **4.2** <u>Bonus</u>. After each fiscal year of the Company during the term of this Agreement, Executive shall be eligible to receive a cash bonus (the "Bonus"), of up to fifty percent (50%) the then Base Salary, which cash bonus shall be based upon the Company's attainment of the performance and/or budgetary targets set forth in Exhibit A attached hereto. The Bonus, if any, for any such fiscal year shall be payable no later than thirty (30) days after the Board of Managers has received and approved the Company's audited financial statements for such fiscal year and in no event later than ninety (90) days after the end of the fiscal year. In the event audited financial statements are not obtainable at a reasonable cost and within the timeframe stated, then the Company will rely on internally-prepared financial statements for purposes of computing the Bonus.

   **4.3** <u>Signing Incentive Compensation</u>. Upon execution of this Agreement, the Company shall pay to Executive a one-time incentive compensation payment of $100,000 (subject to withholding taxes).

5. <u>Benefits.</u>

   **5.1** <u>General</u>. During the term of this Agreement, the Executive shall be entitled to participate in any employee benefit plans and programs which are maintained by the Company for and generally available to executive employees of the Company, all in accordance with the terms of such plans and programs. Such benefit plans and programs will include any and all health, short-term disability, long-term disability and life insurance and Executive investment programs maintained by the Company. Furthermore, the benefits offered to Executive will not be less than those offered and provided to the Chief Executive Officer of Hallmark Management LLC.

   **5.2** <u>Reimbursement of Expenses and Other Benefits</u>. The Company shall reimburse the Executive for all reasonable and ordinary expenses incurred by him on behalf of the Company in the course of his duties hereunder upon the presentation by the Executive of appropriate documentation substantiating the amount of and purpose for which such expenses were incurred. In addition, throughout the term of this Agreement, Executive shall be entitled to a car lease for an appropriate vehicle of Executive's choice at the Company's expense and the Company shall maintain a $1,500,000 life insurance policy on Executive with the beneficiary of Executive's choice. Upon expiration of this Agreement, Executive shall have the right to purchase from the Company any such life insurance policy then in effect for a purchase price equal to its surrender value (or, if there is no surrender value, then for a purchase price equal to its interpolated terminal reserve value), but only if (y) Executive delivers written notice to the Company of his election to purchase such life insurance policy within thirty (30) days after the expiration of this Agreement, and (z) the Executive agrees to assume all obligations under such life insurance policy.

2

5.3    Personal Time Off. The Executive shall be entitled to twenty-five (25) paid days of Personal Time Off (referenced to as "PTO" and as described in the Company's employee handbook applicable to executives) in each calendar year (to be prorated for any calendar year during which the Executive is employed by the Company for less than the full calendar year), which PTO days shall be taken at times consistent with the performance by the Executive of his obligations hereunder. Executive shall be entitled to accrue and carry forward from year to year earned but unused PTO days. Executive's accrued PTO days shall not be subject to reduction.

6.    Negative Covenants.

6.1    Nonsolicitation of Customers. The Executive agrees that, during his employment by the Company and, if this Agreement is terminated prior to the Expiration Date pursuant to Sections 8.2 or 8.3 below, then for an additional period of two (2) years following such termination, he will not, directly or indirectly, call upon or contact (or assist any person or entity in calling upon or in contacting) (i) any person or entity who is a customer of the Company as of the date of termination of the Executive=s employment, or (ii) any person or entity who the Executive or the Company=s sales force called upon, contacted or otherwise solicited on behalf of the Company at any time during the six months preceding the termination of the employment of the Executive, in either case for the purpose of soliciting or selling any products or services in competition with the products and services of the Company.

6.2    Nonsolicitation of Executives. The Executive hereby agrees that, during his employment by the Company and, if this Agreement is terminated prior to the Expiration Date pursuant to Sections 8.2 or 8.3 below, then for an additional period of two (2) years following such termination, he will not, either on his own account or directly or indirectly in conjunction with or on behalf of any person or entity, call upon or solicit any employee of the Company for the purpose or with the intent of enticing that employee from or out of the employ of the Company for any reason whatsoever.

6.3    Remedies. The Executive acknowledges and agrees that, in the event of a prospective or actual breach of any of the provisions of this Section 6 or Section 7 by him, damages would not be an adequate remedy to compensate the Company for the loss of goodwill and other harm to the business of the Company. In the event of a threatened or actual breach of any of the provisions of this Section 6 or Section 7 by the Executive, the parties agree that the Company shall be entitled, if it so elects, to a temporary restraining order and to temporary and permanent injunctive relief to prevent or terminate such anticipated or actual breach. In addition, the Company shall be entitled to such damages as it can show it sustained by reason of such threatened or actual breach. Nothing in this Section 6 or Section 7 shall be construed to limit in any way the remedies of the Company for a breach of the covenants contained in this Section 6 or Section 7. The Company shall have the right to inform any person or entity that the Company reasonably believes to be, or to be contemplating, participating with the Executive or receiving from the Executive assistance in violation of the terms of this Section 6 or Section 7 and the rights of the Company hereunder, that participation by any such person or entity with the Executive in activities in violation of this Section 6 or Section 7 may give rise to claims by the Company against such person or entity. The Executive further agrees that, in the event he breaches any of the covenants contained in this Section 6 or

3

Section 7, the period of time during which the Executive shall be restricted from the activities described herein shall be extended for a period of time equal to any period(s) of time during which the Executive engages in any conduct that violates this Section 6 or Section 7, the purpose of this provision being to secure for the benefit of the Company the entire period of time being bargained for by the Company for the restrictions upon the Executive=s activities.

      6.4     <u>Reasonable Restraints</u>. The Executive agrees that the foregoing covenants impose a reasonable restraint on the Executive in light of the activities and business of the Company as set forth in this Section 6. It is the desired intent of the parties that the provisions of this Section 6 be enforced to the fullest extent permissible under the laws and public policies of Nevada or any other applicable jurisdiction. Accordingly, to the extent that any covenant hereunder or a portion thereof shall be adjudicated to be invalid or unenforceable, this Section 6 shall be reformed such that the restrictions imposed upon the Executive are no greater than would otherwise be permissible under applicable law. Moreover, each provision of this Section 6 is intended to be severable; and in the event that any one or more of the provisions contained in this Section 6 shall for any reason be adjudicated to be invalid or unenforceable and incapable of reformation in accordance with the terms of the preceding sentence, the same shall not affect the validity or enforceability of any other provision of this Section 6, but this Section 6 shall be construed as if such invalid or unenforceable (and nonreformable) provision had not been contained herein.

      6.5     <u>Continuation of Covenants Following the Expiration Date</u>. In the event this Agreement is in full force and effect as of January 1, 2009 and the Company fails to make a reasonable offer at such time to extend the employment of the Executive beyond the Expiration Date, Executive shall be released from the covenants in this Section 6 upon termination of this Agreement at the Expiration Date (if not sooner by virtue of termination pursuant to Section 8.4 below after January 1, 2009 but before the Expiration Date). In the event this Agreement is in full force and effect as of January 1, 2009 and the Company makes a reasonable offer at such time to extend the employment of the Executive beyond the Expiration Date but Executive refuses to accept such reasonable offer to extend employment, the covenants under this Section 6 shall be continuing covenants which survive the termination of this Agreement and last for a period of two (2) years following the Expiration Date. For purposes of this Section 6.5, a "reasonable offer to extend employment" shall mean that the Executive is offered authority, title, terms and conditions for employment that are equal to or more generous than the terms and conditions contained in this Agreement and, more specifically, the Executive shall be offered a base salary of at least $500,000 per year.

      7.     <u>Confidential Information</u>. The Executive shall not at any time during the term of this Agreement or after the termination hereof directly or indirectly divulge, furnish, use, publish or make accessible to any person or entity any Confidential Information (as hereinafter defined). All records of Confidential Information prepared by the Executive or which come into the Executive's possession during the term of this Agreement are and shall remain the property of the Company, and upon termination of the Executive's employment by the Company all such records and copies thereof shall be either left with or returned to the Company. The term "Confidential Information" shall mean information disclosed to the Executive or known, learned, created or observed by him as a consequence of or through his employment by the Company, not generally known in the relevant

4

trade or industry, about the Company's business activities, products, services, customers and suppliers including, but not limited to, information concerning costs, product performance, customer requirements, advertising, sales promotion, publicity, sales data, research, finances, accounting, trade secrets, business plans, client or supplier lists and records, potential client or supplier lists, and client or supplier billing. Notwithstanding the foregoing, "Confidential Information" shall not include information publicly disclosed by the Company or known by the Executive other than because of his employment with the Company.

8.    <u>Termination of Employment</u>.

8.1    <u>Termination By the Company Without Cause</u>.

(a)    This Agreement shall terminate immediately upon the Executive's death.

(b)    In the event the Executive incurs a disability (which for purposes of this Agreement shall mean any mental or physical illness, injury or condition because of which the Executive is unable to fulfill his duties under this Agreement on a full-time basis for a period of at least one hundred eighty (180) consecutive days), then the Company may terminate this Agreement by giving notice thereof to the Executive.

8.2    <u>By the Company with Cause</u>. The Company may terminate this Agreement at any time for cause by giving notice thereof to the Executive. For purposes of this Section 8.2, the term "cause" shall mean (a) the breach by the Executive of any material term or provision of this Agreement, which breach is not cured within ten (10) business days (or longer if mutually agreed upon in writing) after notice of such breach to the Executive by the Company setting forth the facts upon which the breach is based, (b) conviction of a felony, (c) fraud by the Executive with respect to the business or affairs of the Company or any of its affiliates, (d) alcohol or drug abuse by the Executive which materially affects Executive's performance under this Agreement or materially compromises the business reputation of the Company, or (e) Executive's breach of his obligations as a Delta Member under the Operating Agreement then in effect for the Company.

8.3    <u>By Executive Without Cause</u>. The Executive may terminate this Agreement at any time, without cause and for any reason, upon not less than sixty (60) days notice to the Company setting forth the early termination date.

8.4    <u>By Executive With Cause</u>. The Executive may terminate this Agreement at any time for cause by giving notice thereof to the Company. For purposes of this Section 8.4, the term "cause" shall mean: (i) a breach by the Company of any material term or provision of this Agreement, which breach is not cured within ten (10) business days (or longer if mutually agreed upon in writing) after notice of such breach to the Company by the Executive setting forth the facts upon which the breach is based; (ii) a breach by the Beta Member of any of its obligations as a Member under the Operating Agreement then in effect for the Company; or (iii) in the event there is a Change of Control (defined below) of the Beta Member of the Company. For purposes of this Agreement, a "Change of Control" of the Beta Member shall be deemed to have occurred if (y) any persons or entities other than Express Services, Inc. become the beneficial owner of more than fifty percent (50%) of the then outstanding voting capital stock of the Beta Member, or (z) any person

5

other than Robert Funk or William H. Stoller become the beneficial owner of more than fifty percent (50%) of the then outstanding voting capital stock of Express Services, Inc.

8.5  Rights Upon Termination. Upon termination of this Agreement, all rights and obligations of the Company and the Executive (including any personal or legal representative or successor-in-interest to the Executive if deceased or under a legal disability) shall terminate and cease, except as provided below:

8.5.1  Vested Compensation and Benefits. The Executive shall be entitled to receive any compensation or benefits which the Executive has earned and which have vested to the Executive as of the date of termination; provided, however, in the event of termination of this Agreement due to Executive's death, the Company shall provide Executive's heirs or estate an additional thirty (30) days of base salary. Payments of all amounts owing under Section 4.1 shall be prorated to the date of termination.

8.5.2  Continuation of Base Salary Under Certain Circumstances. If this Agreement is terminated pursuant to Section 8.4, the Executive shall be entitled to receive from the Company a lump sum payment in an amount equal to the Base Salary that the Executive would have received for the period following the effective date of termination and lasting until the Expiration Date (the "Guaranteed Salary Amount"). The Guaranteed Salary Amount shall be paid within thirty (30) days of the effective date of termination and shall be subject to applicable withholdings and other deductions required by law or authorized by Executive. Executive agrees and acknowledges that the Guaranteed Salary Amount provided for in this Section 8.5.2 constitutes liquidated damages and shall be deemed to satisfy and be in full and final settlement of all obligations of the Company to Executive under this Employment Agreement in the event of an effective termination pursuant to Section 8.4.

8.5.3  Repayment of Signing Bonus Under Certain Circumstances. If this Agreement is terminated prior to the first anniversary of the Commencement Date pursuant to Section 8.2 or Section 8.3, the Executive shall pay to the Company an amount equal to the product of (i) $100,000, multiplied times (ii) that fraction, expressed as a percentage, determined by dividing (A) the number of calendar days between the date of termination of this Agreement and the first anniversary of the Commencement Date, by (B) 365.

8.5.4  Survival of Negative Covenants. The covenants of the Executive under Sections 6 and 7 shall be continuing covenants which shall survive the termination of this Agreement in those circumstances described in Sections 6.1, 6.2 and 6.5.

9.  General.

9.1  Assignment. The Executive may not assign any of his rights or obligations under this Agreement. The Company may (i) assign any or all of its rights and interests hereunder to one or more of its affiliates, and (ii) designate one or more of its affiliates to perform its obligations hereunder (in any or all of which cases the Company nonetheless shall remain responsible for the performance of all of its obligations hereunder).

6

9.2    Notices.  All notices, requests, demands, claims and other communications hereunder shall be in writing.  Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) if served personally, on the date of such service, or (ii) if mailed by certified or registered mail (return receipt requested), on the second business day after mailing, or (iii) if transmitted by recognized overnight carrier, on the next business day after tender to the carrier.  Such communications shall be sent to the following addresses:

> To the Company:          Hallmark National LLC
>                          8516 N.W. Expressway
>                          Oklahoma City, OK 73162
>                          Attn:  Tom Richards
>
> To the Executive:        Barry D. Bloom
>                          385 Chestnut St.
>                          San Carlos, CA  94070

Any party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other party notice in the manner herein set forth.

9.3    Entire Agreement.  This Agreement and its attachments contain and constitute the entire agreement between and among the parties herein and supersedes all prior agreements and understandings between the parties hereto relating to the subject matter hereof.

9.4    Applicable Law.  This Agreement shall be construed, enforced and governed in accordance with the laws of the State of Nevada, without giving effect to any choice of law or conflict of law rules or provisions that could cause the application of the laws of any jurisdiction other than the State of Nevada to apply.

9.5    Invalidity.  If any provision contained in this Agreement shall for any reason be held to be invalid, illegal, void or unenforceable in any respect, such provision shall be deemed modified so as to constitute a provision conforming as nearly as possible to such invalid, illegal, void or unenforceable provision while still remaining valid and enforceable, and the remaining terms or provisions contained herein shall not be affected thereby.

9.6    Dispute Resolution.  Any dispute arising in any way out of this Agreement and which cannot be resolved by good faith negotiations between the parties within sixty (60) days after either party shall have notified the other party in writing of its desire to arbitrate the dispute shall be submitted to and settled through binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association as from time to time in effect.  Any arbitration shall be undertaken pursuant to the Federal Arbitration Act, where possible, and the decision of the arbitrators shall be final, binding and enforceable in any court of competent jurisdiction.  In any dispute in which a party seeks in excess of $500,000 in damages, three arbitrators shall be employed.  Otherwise, a single arbitrator shall be employed.  The arbitration proceedings shall be conducted in a neutral and unbiased location.  The arbitrators shall have the authority to award costs and expenses

7

of arbitration to either party as the arbitrators see fit. The arbitrators shall not have the authority to award punitive, consequential or indirect damages against either party, and each party hereby waives the right to such damages and agrees to receive only those actual damages directly resulting from the claim asserted. The parties acknowledge and agree that nothing in this Section 9.6 shall be construed as prohibiting the parties from pursuing in any court of competent jurisdiction any remedies available to it for any breach or threatened breach of any of the covenants in this Agreement.

9.7    Binding Effect. This Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective heirs, executors, personal representatives, successors and permitted assigns.

9.8    Construction. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

9.9    Amendment and Waiver. This Agreement may only be amended by a writing executed by each of the parties hereto. Any party may waive any requirement to perform by the other party, provided that such waiver shall be in writing and executed by the party granting the waiver. The parties agree that a waiver by one party on one occasion shall not be deemed a waiver on any other occasion.

9.10    Survival. The provisions of Sections 6, 7 and 8.5 shall survive the termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

COMPANY:                           HALLMARK NATIONAL LLC

                                   By: _____
                                   Thomas N. Richards, Manager

                                   By: _____
                                   A. Marshall Snipes, Manager

EXECUTIVE:                         _____
                                   Barry D. Bloom

8