Meryl Macklin (CA Bar No. 115053)
Thomas Kerr (CA Bar No. 241530)
HOLME ROBERTS & OWEN LLP
560 Mission St.
25th Floor
San Francisco, CA 94105
Telephone:  (415) 268-2000
Facsimile:   (415) 268-1999
meryl.macklin@hro.com
tom.kerr@hro.com

Attorneys for Defendants
Claimetrics Management LLC
Hallmark National LLC

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| BARRY D. BLOOM, an individual<br><br>Plaintiff and<br>Counterdefendant,<br><br>v.<br><br>CLAIMETRICS MANAGEMENT LLC, a Nevada limited liability company; HALLMARK NATIONAL LLC, a Nevada limited liability company; and DOES 1 through 20, inclusive<br>Defendants and<br>Counterclaimant. | CASE NO. C 08-02155-MHP<br><br>Honorable Marilyn H. Patel<br><br>**DECLARATION OF THOMAS N. RICHARDS IN SUPPORT OF DEFENDANTS' MOTION FOR ADMINISTRATIVE RELIEF TO AMEND RESPONSE TO AUGUST 7, 2008, ORDER TO SHOW CAUSE AND AMENDED RESPONSE TO ORDER TO SHOW CAUSE** |

///

///

///

///

///

1

## DECLARATION OF THOMAS RICHARDS

I, Thomas Richards, declare:

1.      I am the Chief Financial Officer of Claimetrics Management LLC ("Claimetrics").  I am trained as an accountant, and in my role as Chief Financial Officer, I regularly perform accounting duties as part of my job.  I make this Declaration on the basis of facts within my personal knowledge, as to which I am competent to testify if called upon to do so.

2.      Barry Bloom was hired in April, 2006, as the Chief Operating Officer of Hallmark Management LLC (now known as Claimetrics).  As of mid-October, 2007, Marshall Snipes, CEO of Claimetrics, and I had determined that Mr. Bloom had failed to meet the expectations set out for him and that he had materially breached his Employment Agreement.  We therefore decided to terminate Mr. Bloom for cause.  Attached hereto as Exhibit A is a true and correct copy of the "Notice of Termination of Employment Agreement," which we provided to Mr. Bloom, reflecting our decision to terminate Mr. Bloom for cause.

3.      In conjunction with the termination of Mr. Bloom, I calculated the value of Claimetrics in order to determine the value of Mr. Bloom's interest in the company for the purposes of Claimetrics' redemption of Mr. Bloom's interest pursuant to Claimetrics' Amended and Restated Operating Agreement (the "Operating Agreement").  Attached hereto as Exhibit B is a true and correct copy of the Operating Agreement.

4.      In assessing Claimetrics' value, I referred to the definition of "Company Value" on pages 2-3 of the Operating Agreement.  I used the calculation called for in the "Company Value" Section of the Operating Agreement in order to assess Claimetrics' value.

5.      After performing the calculations as proscribed in the Operating Agreement, I determined the value of Claimetrics was negative – essentially, that Claimetrics' expenses exceeded its revenues.

6.      Accordingly, because I determined Claimetrics' value to be negative, I determined that Mr. Bloom's 20,000 Delta Units in Claimetrics were to be valued at $0.00.  (60% of zero is zero.)

2

1    7.    In accordance with the Operating Agreement, I then prepared a Unit Redemption

2  Agreement in order to redeem Mr. Bloom's interest in Claimetrics, which valued Mr. Bloom's

3  interest at $0.00. Attached hereto as Exhibit C is a true and correct copy of the Unit Redemption

4  Agreement, effective October 31, 2007.

5    8.    None of the current Members of Claimetrics Management LLC, formerly Hallmark

6  Management LLC, are citizens of California, nor were any of them citizens of California at the time

7  this action was filed or removed.

8

9    I declare under penalty of perjury under the laws of the United States of America that the

10  foregoing is true and correct.

11    Executed this 15th day of August 2008, at Oklahoma City, Oklahoma.

12

13    Thomas Richards

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

Declaration of Thomas Richards
Case No. C 08-02155-MHP
#39340 v1

# EXHIBIT A

# NOTICE OF TERMINATION
# OF EMPLOYMENT AGREEMENT

**WHEREAS**, Claimetrics Management, LLC (formerly Hallmark National, LLC), a Nevada limited liability company ("Claimetrics") and Barry D. Bloom, an individual ("Executive") executed that certain Employment Agreement commencing April 24, 2006, a copy of which is attached hereto as *Exhibit A*;

**WHEREAS**, pursuant to the terms of the Employment Agreement, Claimetrics employed Executive as the President and Chief Operating Officer of Claimetrics;

**WHEREAS**, Section 3.1. of the Employment Agreement provides that Executive will perform such services as Claimetrics or the Chief Executive Officer directs;

**WHEREAS**, Claimetrics directed Executive to meet certain goals for the sales, marketing and establishment of new business for Claimetrics;

**WHEREAS**, Claimetrics directed Executive to meet certain milestones in connection with the development of the Claimetrics third party claim administration product;

**WHERAS**, Executive has consistently failed to meet said sales, marketing and business development goals;

**WHEREAS**, Executive has consistently failed to meet the milestones for the development of the Claimetrics third party claim administration product;

**WHEREAS**, Executive's failure to consistently meet the sales, marketing and business development goals established by Claimetrics constitutes a material breach of the Employment Agreement;

**WHEREAS**, Executive's failure to consistently meet the milestones for the development of the Claimetrics third party claim administration product constitutes a material breach of the Employment Agreement;

**WHEREAS**, Section 8.2 of the Employment Agreement provides that Claimetrics may terminate the Employment Agreement for cause if Executive commits a material breach of the Employment Agreement and such breach is not cured within ten (10) days (the "Notice Cure Period") of Claimetrics providing Executive with written notice of such breach;

**WHEREAS**, by letter dated October 15, 2007, a copy of which is attached hereto as *Exhibit B*, Claimetrics provided Executive with written notice of Executive's material breaches of the Employment Agreement; and

**WHEREAS**, Executive did not cure such breaches within the Notice Cure Period.

**NOW, THEREFORE, EXECUTIVE IS HEREBY NOTIFIED AS FOLLOWS:**

1.    **Recitals**.  The explanatory statements set forth above are incorporated by reference in, and made a part of this Notice of Termination of Employment Agreement, as though fully rewritten here at length.

2.    **Notice of Termination**.   Executive's failure to satisfy (i) the sales, marketing and business development goals and (ii) the milestones for the development of the Claimetrics third party administration product established for Executive by Claimetrics constitutes a material breach of Section 8.2 of the Employment Agreement.  Accordingly, Executive is hereby notified that, pursuant to Section 8.2 of the Employment Agreement, Claimetrics immediately terminates the Employment Agreement and the services of Executive effective November 7, 2007.

**Claimetrics**

Claimetrics Management, LLC,
a Nevada limited liability company

By: _____
A. Marshall Snipes, Manager

Dated: _____11-06-07_____

By: _____
Thomas N. Richards, Manager

Dated: ____Nov 6, 2007_____

**Exhibit A**

**Employment Agreement**

[Attached]

## EXECUTIVE EMPLOYMENT AGREEMENT

This EXECUTIVE EMPLOYMENT AGREEMENT ("Agreement") is made effective as of the ____ day of _____, 2006, by and between Hallmark National LLC, a Nevada limited liability company (the "Company"), and Barry D. Bloom (the "Executive").

### WITNESSETH:

WHEREAS, the Company entered into an employment arrangement with Executive as of April 24, 2006 upon the terms and conditions set forth in this Agreement; and

WHEREAS, the Company and the Executive desires to memorialize the terms and conditions of the employment arrangement by executing this Agreement;

WHEREAS, the Executive desires to be so employed upon such terms and conditions;

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties agree as follows:

1.    **Employment.** Subject to the terms and conditions of this Agreement, the Company hereby employs the Executive, and the Executive hereby accepts employment with the Company to serve as the Company's President and Chief Operating Officer.

2.    **Term of Employment.** The term of this Agreement shall commence on April 24, 2006 (the "Commencement Date") and shall continue until 5:00 p.m. Oklahoma City time on April 30, 2009 (the "Expiration Date"), unless sooner terminated as provided in Section 8.

3.    **Duties and Responsibilities.**

3.1    As President and the Chief Operating Officer of the Company. The Executive shall serve as the President and Chief Operating Officer of the Company. In that capacity, he has the normal duties, responsibilities and authority of the President and the Chief Operating Officer and will perform such services as the Company or the Chief Executive Officer from time to time directs, consistent with the policies established from time to time by the Board of Managers of the Company. The Company shall provide to the Executive adequate office facilities, staff and reporting relationships commensurate with his position to enable him to perform his duties hereunder. The Executive's office shall be in California at a location selected by the Executive, subject to travel necessary for the performance of his duties hereunder.

3.2    Extent of Services. The Executive shall report to the Chief Executive Officer of the Company and the Board of Managers, and Executive shall devote his best efforts and full business time and attention (except for permitted vacation periods and reasonable periods of illness or other capacity) to the Business and affairs of the Company. Executive shall perform his duties and responsibilities to the best of his abilities in a diligent, trustworthy, businesslike and efficient manner.

4.    Compensation.

        4.1    Base Salary. The Company shall pay to the Executive for the services to be rendered by the Executive hereunder a base salary of $300,000 per year (the "Base Salary"). The Base Salary shall be payable in equal installments (subject to withholding tax) in accordance with the Company's regular payroll schedule.

        4.2    Bonus. After each fiscal year of the Company during the term of this Agreement, Executive shall be eligible to receive a cash bonus (the "Bonus"), of up to fifty percent (50%) the then Base Salary, which cash bonus shall be based upon the Company's attainment of the performance and/or budgetary targets set forth in Exhibit A attached hereto. The Bonus, if any, for any such fiscal year shall be payable no later than thirty (30) days after the Board of Managers has received and approved the Company's audited financial statements for such fiscal year and in no event later than ninety (90) days after the end of the fiscal year. In the event audited financial statements are not obtainable at a reasonable cost and within the timeframe stated, then the Company will rely on internally-prepared financial statements for purposes of computing the Bonus.

        4.3    Signing Incentive Compensation. Upon execution of this Agreement, the Company shall pay to Executive a one-time incentive compensation payment of $100,000 (subject to withholding taxes).

5.    Benefits.

        5.1    General. During the term of this Agreement, the Executive shall be entitled to participate in any employee benefit plans and programs which are maintained by the Company for and generally available to executive employees of the Company, all in accordance with the terms of such plans and programs. Such benefit plans and programs will include any and all health, short-term disability, long-term disability and life insurance and Executive investment programs maintained by the Company. Furthermore, the benefits offered to Executive will not be less than those offered and provided to the Chief Executive Officer of Hallmark Management LLC.

        5.2    Reimbursement of Expenses and Other Benefits. The Company shall reimburse the Executive for all reasonable and ordinary expenses incurred by him on behalf of the Company in the course of his duties hereunder upon the presentation by the Executive of appropriate documentation substantiating the amount of and purpose for which such expenses were incurred. In addition, throughout the term of this Agreement, Executive shall be entitled to a car lease for an appropriate vehicle of Executive's choice at the Company's expense and the Company shall maintain a $1,500,000 life insurance policy on Executive with the beneficiary of Executive's choice. Upon expiration of this Agreement, Executive shall have the right to purchase from the Company any such life insurance policy then in effect for a purchase price equal to its surrender value (or, if there is no surrender value, then for a purchase price equal to its interpolated terminal reserve value), but only if (y) Executive delivers written notice to the Company of his election to purchase such life insurance policy within thirty (30) days after the expiration of this Agreement, and (z) the Executive agrees to assume all obligations under such life insurance policy.

2

5.3    Personal Time Off.  The Executive shall be entitled to twenty-five (25) paid days of Personal Time Off (referenced to as "PTO" and as described in the Company's employee handbook applicable to executives) in each calendar year (to be prorated for any calendar year during which the Executive is employed by the Company for less than the full calendar year), which PTO days shall be taken at times consistent with the performance by the Executive of his obligations hereunder.  Executive shall be entitled to accrue and carry forward from year to year earned but unused PTO days.  Executive's accrued PTO days shall not be subject to reduction.

6.    Negative Covenants.

6.1    Nonsolicitation of Customers.  The Executive agrees that, during his employment by the Company and, if this Agreement is terminated prior to the Expiration Date pursuant to Sections 8.2 or 8.3 below, then for an additional period of two (2) years following such termination, he will not, directly or indirectly, call upon or contact (or assist any person or entity in calling upon or in contacting) (i) any person or entity who is a customer of the Company as of the date of termination of the Executive=s employment, or (ii) any person or entity who the Executive or the Company=s sales force called upon, contacted or otherwise solicited on behalf of the Company at any time during the six months preceding the termination of the employment of the Executive, in either case for the purpose of soliciting or selling any products or services in competition with the products and services of the Company.

6.2    Nonsolicitation of Executives.  The Executive hereby agrees that, during his employment by the Company and, if this Agreement is terminated prior to the Expiration Date pursuant to Sections 8.2 or 8.3 below, then for an additional period of two (2) years following such termination, he will not, either on his own account or directly or indirectly in conjunction with or on behalf of any person or entity, call upon or solicit any employee of the Company for the purpose or with the intent of enticing that employee from or out of the employ of the Company for any reason whatsoever.

6.3    Remedies.  The Executive acknowledges and agrees that, in the event of a prospective or actual breach of any of the provisions of this Section 6 or Section 7 by him, damages would not be an adequate remedy to compensate the Company for the loss of goodwill and other harm to the business of the Company.  In the event of a threatened or actual breach of any of the provisions of this Section 6 or Section 7 by the Executive, the parties agree that the Company shall be entitled, if it so elects, to a temporary restraining order and to temporary and permanent injunctive relief to prevent or terminate such anticipated or actual breach.  In addition, the Company shall be entitled to such damages as it can show it sustained by reason of such threatened or actual breach. Nothing in this Section 6 or Section 7 shall be construed to limit in any way the remedies of the Company for a breach of the covenants contained in this Section 6 or Section 7.  The Company shall have the right to inform any person or entity that the Company reasonably believes to be, or to be contemplating, participating with the Executive or receiving from the Executive assistance in violation of the terms of this Section 6 or Section 7 and the rights of the Company hereunder, that participation by any such person or entity with the Executive in activities in violation of this Section 6 or Section 7 may give rise to claims by the Company against such person or entity. The Executive further agrees that, in the event he breaches any of the covenants contained in this Section 6 or

3

Section 7, the period of time during which the Executive shall be restricted from the activities described herein shall be extended for a period of time equal to any period(s) of time during which the Executive engages in any conduct that violates this Section 6 or Section 7, the purpose of this provision being to secure for the benefit of the Company the entire period of time being bargained for by the Company for the restrictions upon the Executive=s activities.

    6.4    Reasonable Restraints. The Executive agrees that the foregoing covenants impose a reasonable restraint on the Executive in light of the activities and business of the Company as set forth in this Section 6. It is the desired intent of the parties that the provisions of this Section 6 be enforced to the fullest extent permissible under the laws and public policies of Nevada or any other applicable jurisdiction. Accordingly, to the extent that any covenant hereunder or a portion thereof shall be adjudicated to be invalid or unenforceable, this Section 6 shall be reformed such that the restrictions imposed upon the Executive are no greater than would otherwise be permissible under applicable law. Moreover, each provision of this Section 6 is intended to be severable; and in the event that any one or more of the provisions contained in this Section 6 shall for any reason be adjudicated to be invalid or unenforceable and incapable of reformation in accordance with the terms of the preceding sentence, the same shall not affect the validity or enforceability of any other provision of this Section 6, but this Section 6 shall be construed as if such invalid or unenforceable (and nonreformable) provision had not been contained herein.

    6.5    Continuation of Covenants Following the Expiration Date. In the event this Agreement is in full force and effect as of January 1, 2009 and the Company fails to make a reasonable offer at such time to extend the employment of the Executive beyond the Expiration Date, Executive shall be released from the covenants in this Section 6 upon termination of this Agreement at the Expiration Date (if not sooner by virtue of termination pursuant to Section 8.4 below after January 1, 2009 but before the Expiration Date). In the event this Agreement is in full force and effect as of January 1, 2009 and the Company makes a reasonable offer at such time to extend the employment of the Executive beyond the Expiration Date but Executive refuses to accept such reasonable offer to extend employment, the covenants under this Section 6 shall be continuing covenants which survive the termination of this Agreement and last for a period of two (2) years following the Expiration Date. For purposes of this Section 6.5, a "reasonable offer to extend employment" shall mean that the Executive is offered authority, title, terms and conditions for employment that are equal to or more generous than the terms and conditions contained in this Agreement and, more specifically, the Executive shall be offered a base salary of at least $500,000 per year.

    7.    Confidential Information. The Executive shall not at any time during the term of this Agreement or after the termination hereof directly or indirectly divulge, furnish, use, publish or make accessible to any person or entity any Confidential Information (as hereinafter defined). All records of Confidential Information prepared by the Executive or which come into the Executive's possession during the term of this Agreement are and shall remain the property of the Company, and upon termination of the Executive's employment by the Company all such records and copies thereof shall be either left with or returned to the Company. The term "Confidential Information" shall mean information disclosed to the Executive or known, learned, created or observed by him as a consequence of or through his employment by the Company, not generally known in the relevant

4

trade or industry, about the Company's business activities, products, services, customers and suppliers including, but not limited to, information concerning costs, product performance, customer requirements, advertising, sales promotion, publicity, sales data, research, finances, accounting, trade secrets, business plans, client or supplier lists and records, potential client or supplier lists, and client or supplier billing. Notwithstanding the foregoing, "Confidential Information" shall not include information publicly disclosed by the Company or known by the Executive other than because of his employment with the Company.

8.    <u>Termination of Employment</u>.

8.1    <u>Termination By the Company Without Cause</u>.

(a)    This Agreement shall terminate immediately upon the Executive's death.

(b)    In the event the Executive incurs a disability (which for purposes of this Agreement shall mean any mental or physical illness, injury or condition because of which the Executive is unable to fulfill his duties under this Agreement on a full-time basis for a period of at least one hundred eighty (180) consecutive days), then the Company may terminate this Agreement by giving notice thereof to the Executive.

8.2    <u>By the Company with Cause</u>. The Company may terminate this Agreement at any time for cause by giving notice thereof to the Executive. For purposes of this Section 8.2, the term "cause" shall mean (a) the breach by the Executive of any material term or provision of this Agreement, which breach is not cured within ten (10) business days (or longer if mutually agreed upon in writing) after notice of such breach to the Executive by the Company setting forth the facts upon which the breach is based, (b) conviction of a felony, (c) fraud by the Executive with respect to the business or affairs of the Company or any of its affiliates, (d) alcohol or drug abuse by the Executive which materially affects Executive's performance under this Agreement or materially compromises the business reputation of the Company, or (e) Executive's breach of his obligations as a Delta Member under the Operating Agreement then in effect for the Company.

8.3    <u>By Executive Without Cause</u>. The Executive may terminate this Agreement at any time, without cause and for any reason, upon not less than sixty (60) days notice to the Company setting forth the early termination date.

8.4    <u>By Executive With Cause</u>. The Executive may terminate this Agreement at any time for cause by giving notice thereof to the Company. For purposes of this Section 8.4, the term "cause" shall mean: (i) a breach by the Company of any material term or provision of this Agreement, which breach is not cured within ten (10) business days (or longer if mutually agreed upon in writing) after notice of such breach to the Company by the Executive setting forth the facts upon which the breach is based; (ii) a breach by the Beta Member of any of its obligations as a Member under the Operating Agreement then in effect for the Company; or (iii) in the event there is a Change of Control (defined below) of the Beta Member of the Company. For purposes of this Agreement, a "Change of Control" of the Beta Member shall be deemed to have occurred if (y) any persons or entities other than Express Services, Inc. become the beneficial owner of more than fifty percent (50%) of the then outstanding voting capital stock of the Beta Member, or (z) any person

5

other than Robert Funk or William H. Stoller become the beneficial owner of more than fifty percent (50%) of the then outstanding voting capital stock of Express Services, Inc.

   8.5    Rights Upon Termination. Upon termination of this Agreement, all rights and obligations of the Company and the Executive (including any personal or legal representative or successor-in-interest to the Executive if deceased or under a legal disability) shall terminate and cease, except as provided below:

      8.5.1    Vested Compensation and Benefits. The Executive shall be entitled to receive any compensation or benefits which the Executive has earned and which have vested to the Executive as of the date of termination; provided, however, in the event of termination of this Agreement due to Executive's death, the Company shall provide Executive's heirs or estate an additional thirty (30) days of base salary. Payments of all amounts owing under Section 4.1 shall be prorated to the date of termination.

      8.5.2    Continuation of Base Salary Under Certain Circumstances. If this Agreement is terminated pursuant to Section 8.4, the Executive shall be entitled to receive from the Company a lump sum payment in an amount equal to the Base Salary that the Executive would have received for the period following the effective date of termination and lasting until the Expiration Date (the "Guaranteed Salary Amount"). The Guaranteed Salary Amount shall be paid within thirty (30) days of the effective date of termination and shall be subject to applicable withholdings and other deductions required by law or authorized by Executive. Executive agrees and acknowledges that the Guaranteed Salary Amount provided for in this Section 8.5.2 constitutes liquidated damages and shall be deemed to satisfy and be in full and final settlement of all obligations of the Company to Executive under this Employment Agreement in the event of an effective termination pursuant to Section 8.4.

      8.5.3    Repayment of Signing Bonus Under Certain Circumstances. If this Agreement is terminated prior to the first anniversary of the Commencement Date pursuant to Section 8.2 or Section 8.3, the Executive shall pay to the Company an amount equal to the product of (i) $100,000, multiplied times (ii) that fraction, expressed as a percentage, determined by dividing (A) the number of calendar days between the date of termination of this Agreement and the first anniversary of the Commencement Date, by (B) 365.

      8.5.4    Survival of Negative Covenants. The covenants of the Executive under Sections 6 and 7 shall be continuing covenants which shall survive the termination of this Agreement in those circumstances described in Sections 6.1, 6.2 and 6.5.

   9.    General.

   9.1    Assignment. The Executive may not assign any of his rights or obligations under this Agreement. The Company may (i) assign any or all of its rights and interests hereunder to one or more of its affiliates, and (ii) designate one or more of its affiliates to perform its obligations hereunder (in any or all of which cases the Company nonetheless shall remain responsible for the performance of all of its obligations hereunder).

6

9.2    Notices. All notices, requests, demands, claims and other communications hereunder shall be in writing. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) if served personally, on the date of such service, or (ii) if mailed by certified or registered mail (return receipt requested), on the second business day after mailing, or (iii) if transmitted by recognized overnight carrier, on the next business day after tender to the carrier. Such communications shall be sent to the following addresses:

<u>To the Company:</u>              Hallmark National LLC
                                8516 N.W. Expressway
                                Oklahoma City, OK 73162
                                Attn: Tom Richards

<u>To the Executive:</u>            Barry D. Bloom
                                385 Chestnut St.
                                San Carlos, CA 94070

Any party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other party notice in the manner herein set forth.

9.3    <u>Entire Agreement</u>. This Agreement and its attachments contain and constitute the entire agreement between and among the parties herein and supersedes all prior agreements and understandings between the parties hereto relating to the subject matter hereof.

9.4    <u>Applicable Law</u>. This Agreement shall be construed, enforced and governed in accordance with the laws of the State of Nevada, without giving effect to any choice of law or conflict of law rules or provisions that could cause the application of the laws of any jurisdiction other than the State of Nevada to apply.

9.5    <u>Invalidity</u>. If any provision contained in this Agreement shall for any reason be held to be invalid, illegal, void or unenforceable in any respect, such provision shall be deemed modified so as to constitute a provision conforming as nearly as possible to such invalid, illegal, void or unenforceable provision while still remaining valid and enforceable, and the remaining terms or provisions contained herein shall not be affected thereby.

9.6    <u>Dispute Resolution</u>. Any dispute arising in any way out of this Agreement and which cannot be resolved by good faith negotiations between the parties within sixty (60) days after either party shall have notified the other party in writing of its desire to arbitrate the dispute shall be submitted to and settled through binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association as from time to time in effect. Any arbitration shall be undertaken pursuant to the Federal Arbitration Act, where possible, and the decision of the arbitrators shall be final, binding and enforceable in any court of competent jurisdiction. In any dispute in which a party seeks in excess of $500,000 in damages, three arbitrators shall be employed. Otherwise, a single arbitrator shall be employed. The arbitration proceedings shall be conducted in a neutral and unbiased location. The arbitrators shall have the authority to award costs and expenses

7

of arbitration to either party as the arbitrators see fit. The arbitrators shall not have the authority to award punitive, consequential or indirect damages against either party, and each party hereby waives the right to such damages and agrees to receive only those actual damages directly resulting from the claim asserted. The parties acknowledge and agree that nothing in this Section 9.6 shall be construed as prohibiting the parties from pursuing in any court of competent jurisdiction any remedies available to it for any breach or threatened breach of any of the covenants in this Agreement.

9.7    Binding Effect. This Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective heirs, executors, personal representatives, successors and permitted assigns.

9.8    Construction. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

9.9    Amendment and Waiver. This Agreement may only be amended by a writing executed by each of the parties hereto. Any party may waive any requirement to perform by the other party, provided that such waiver shall be in writing and executed by the party granting the waiver. The parties agree that a waiver by one party on one occasion shall not be deemed a waiver on any other occasion.

9.10    Survival. The provisions of Sections 6, 7 and 8.5 shall survive the termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

COMPANY:                                   HALLMARK NATIONAL LLC

                                           By: _____
                                                Thomas N. Richards, Manager

                                           By: _____
                                                A. Marshall Snipes, Manager

EXECUTIVE:                                 _____
                                           Barry D. Bloom

8

**Exhibit B**

**Notice of Breach**

[Attached]



October 15, 2007

***Federal Express***

Mr. Barry D. Bloom
395 Chestnut Street
San Carlos, CA 94070

Dear Barry:

As you are aware, Claimetrics Management, LLC (formerly Hallmark Management, LLC) was formed for the purpose of controlling the costs of conducting third party administration of insurance claims on behalf of its constituent clients.

Claimetrics' activities have been funded through capital contributions and borrowed funds. That debt and capital have been invested in the organization and operation of Claimetrics. Significant costs have been incurred for personnel, marketing, development and training, all for the purpose of creating a system and product which can be successfully marketed on a wholesale basis to a nationwide group of clients.

Claimetrics engaged you as its President and Chief Operating Officer under and Employment Agreement dated on or about April 24, 2006. Your role under the contract was to serve in that capacity and to perform such services as the Company or the Chief Executive Officer directed, consistent with the policies established by the Board of Managers of the Company from time to time.

You came to Claimetrics with significant experience in this business. Your charge was to lead Claimetrics in developing and marketing the product. To accomplish those objectives, I and the Board of Managers solicited your advice and recommendations to create the proprietary third party claim administration product (software); develop a system of administering claims using that product; hire and train personnel to utilize that product and to lead the marketing effort to develop clients who would hire Claimetrics to implement that product.

During the course of that process, I and the Board of Managers asked you to establish certain developmental and marketing goals. You established a series of milestones for product development and sales and the Board of Managers adopted those goals on behalf of Claimetrics.

In short the milestones for sales and development have not been met. And, the failure to meet those goals has put Claimetrics in serious financial jeopardy, in that, Claimetrics' sources of capital are not unlimited and its debts need to be repaid.

You set a sales goal of $3.15 million in annualized revenue in new business by September 1, 2007, resulting in $1.05 million in revenue from September through December 2007. As of the date of this letter, we have no new business. Further, you have advised Tom Richards and me that you do not expect to have any revenue to be developed for Claimetrics during the balance of this year. We view this as a failure to

achieve the sales directives established by you, but adopted by the Board of Managers of Claimetrics.

You stated that Claimetrics needed to be ready to take on new business by September, 2007. To achieve that goal, you have advised that by March 31, 2007, Claimetrics needed to:

    (i)        develop operations policies and procedures for claims operations (WC, DIS, LIAB, CLINICAL) during the first quarter of 2007; and

    (ii)       begin and substantially complete the implementation of claim operating software (this was later adjusted to September 1, 2007 at a July 26, 2007 meeting of the Board of Managers)

You further stated that by June 30, 2007, Claimetrics needed to begin and substantially complete the preparation of the analytics/data warehouse software.

Finally, you stated that by September 30, 2007, Claimetrics needed to implement operations of the software in conjunction with its first customer. All of this operations activity was being conducted along with the marketing activity. We view this as a failure to achieve the operational directives established by you, but adopted by the Board of Managers of Claimetrics.

When asked about your progress, you stated that you will need more time to accomplish both the sales and operational directives established by the Board of Managers. When reminded that the sources of debt and capital are limited, you stated that you will need more money to achieve the sales and operational directives. When asked about how much time and how much money, you have not provided a satisfactory answer. And this response is not acceptable.

Accordingly, this letter will serve as your notice of breach of a material term of your Employment Agreement under Section 8.2(a) of that agreement. Under the terms of the Employment Agreement you have ten (10) days to cure these breaches. We regret that this unfortunate conclusion has been reached, but cannot continue to conduct the business of Claimetrics with this demonstrated lack of performance. At the end of the ten (10) day cure period, the Board of Managers and I will review your performance and make any required decisions.

If you have questions, you can contact me at your convenience.

Very Truly Yours,

Marshall Snipes,
President
Claimetrics Management, LLC

2

Claimetrics Management, LLC
Quarterly Board of Managers Meeting Minutes
October 30, 2007
3:00 PM
Oklahoma City, Oklahoma

The meeting was called to order by Marshall Snipes, CEO of Claimetrics. All members were present – Marshall Snipes and Tom Richards in person and Barry Bloom telephonically.

The first order of business was the approval of the minutes of the July 26, 2007 Quarterly Board of Managers Meeting. The minutes were approved with Tom Richards and Marshall Snipes voting yes and Barry Bloom abstaining until he had time to further review.

The second order of business was to discuss Barry Bloom's amended employment agreement. Barry informed the Board that the employment agreement as amended was not acceptable. Accordingly, the following motion was approved with Tom Richards and Marshall Snipes voting yes and Barry Bloom voting no.

MOTION: that the Chairman be authorized on behalf of the Company to provide notice of termination of the Employment Agreement between the Company and Barry Bloom effective October 31, 2007, for breach of that Agreement, which breach was not cured after notice of the breach was provided and the prescribed period of cure of that breach lapsed without satisfactory cure by Barry Bloom. I further move that the Chairman take any an all additional action as may be required by the Company to protect and preserve the rights of the Company."

The Board then asked Barry Bloom to reconsider his decision and since the termination was not effective until the next day, that he take 24 hours to reconsider and the Board would reconvene on October 31, 2007. The Board meeting was adjourned to be reconvened on October 31,, 2007.

The Board reconvened on October 31, 2007 with all members present, Barry Bloom telephonically and Marshall Snipes and Tom Richards in person. Barry Bloom reconfirmed his decision from the previous day and it was noted that the Employment Agreement was terminated.

Barry Bloom inquired if we could negotiate a severance. A discussion was held regarding a severance and the parties agreed as follows:
   (1) Barry would be paid his regular salary and benefits through December 31, 2007
   (2) Barry would be paid a lump sum in January of $_____
   (3) Barry would assign his Claimetrics Delta Units to Claimetrics
   (4) Barry would assign his Units in Pebble Partners to Pebble Partners
   (5) Claimetrics would release Barry from the restrictive covenants in the Employment
       Agreement
   (6) ????

Claimetrics Management, LLC
Quarterly Board of Managers Meeting Agenda
October 30, 2007
3:00 PM
Oklahoma City, Oklahoma

1.   Approval of minutes from last meeting
2.   Personnel
         Barry Bloom's Amended Employment Agreement and Ownership
             Agreement
         Leigh Stepan's Employment Agreement
3.   Review of financial statements and comparison to budget
4.   Sales status and review
5.   Revised milestones discussion
6.   Discussion of operations
7.   Discussion of financing options
8.   Adjourn

# **EXHIBIT B**

CLAIMETRICS MANAGEMENT, LLC
AMENDED AND RESTATED OPERATING AGREEMENT

This Amended and Restated Operating Agreement (the "Operating Agreement") of Claimetrics Management, LLC, a Nevada limited liability company (the "Company"), is made as of October 1, 2006, by and among each of the Members executing this Agreement and listed on Schedule A, and hereby amends and restates that Operating Agreement of the Company dated April 21, 2006.

ARTICLE I
DEFINITIONS

1.1    Definitions.    As used in this Agreement, the following terms shall have the following meanings:

"Act" shall mean Chapter 86 of the Nevada Revised Statutes as now in effect or as hereafter amended.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Tax Year or prior to liquidation of the Company, after giving effect to all adjustments required under this Agreement or the Treasury Regulations.

"Affiliate" shall mean, when used with reference to a specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the specified Person. For purposes of this definition, the term "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise (and the terms "controlling" and "controlled" have meanings correlative to the foregoing).

"Agreement" means this Operating Agreement, as originally executed and as may be amended, modified, supplemented or restated from time to time.

"Articles of Organization" shall mean the Articles of Organization of the Company, as amended from time to time.

"Beta Unitholder" means with respect to any Beta Unit, the record holder thereof, as set forth on Schedule A.

"Beta Units" means a class of Units as provided for in this Agreement.

"Book Value" means, with respect to any Company asset, the Company's adjusted basis for federal income tax purposes, adjusted from time to time as required or permitted by Treasury Regulation Section 1.704-1(b)(2)(iv); provided that the Book Value of each asset of the Company shall be adjusted as of the date of this Agreement pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f) in a manner determined by the Managers so that the aggregate Book Value of the Company's assets (net of the Company's liabilities) as of such date is equal to the

1

aggregate initial Capital Account balances of the Members (immediately after the Members' Capital Contributions are made).

"Business" shall mean to provide third-party administrative services with respect to the management of insurance plans for businesses.

"Capital Account" means the capital account maintained for a Member pursuant to Section 4.3.

"Capital Contribution" means the cash and agreed fair market value of any asset contributed by a Member to the Company.

"Cash Flow" shall mean cash funds derived from operations of the Company (including interest received on reserves), without reduction for any noncash charges, but less cash funds used to pay current operating expenses and to pay or establish reasonable reserves for future expenses, Debt payments, and capital improvements and replacements as determined by the Managers. Cash Flow shall be increased by the reduction of any reserve previously established.

"Change of Control" shall be deemed to have occurred, with respect to the Beta Member, if (y) any Persons other than Express Services, Inc. become the beneficial owner of more than fifty percent (50%) of the then outstanding voting capital stock of the Beta Member, or (z) any Persons other than Robert Funk or William H. Stoller become the beneficial owner of more than fifty percent (50%) then outstanding voting capital stock of Express Services, Inc.. With respect to all Delta Members that are corporations, limited partnerships, limited liability companies or other similar entities, a Change of Control shall be deemed to have occurred if any Person other than a majority owner of such Delta Member as of the date such Delta Member becomes a party to this Agreement become the beneficial owner of more than fifty percent (50%) of the then outstanding equity of such Delta Member.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company Minimum Gain" has the meaning set forth for "partnership minimum gain" in Treasury Regulation Section 1.704-2(d).

"Company Value" shall mean the value of the Company determined pursuant to the following calculation: the sum of (x) 1.85 multiplied by the Company's annual gross sales revenue and (y) the product of 10 multiplied by the Company's annual earnings before interest, depreciation, taxes and amortization ("EBITDA"), with said sum divided by two (2). Annual gross revenues and annual EBITDA shall be based on the four most recently completed calendar quarters (the "Valuation Period") and as determined by the Company's internal accountants, consistent with the Company's normal accounting procedures and generally accepted accounting principles. In the event, at any time prior to the Company Value calculation, the Company loses a client or a group of clients that collectively represented an annualized loss of revenues for the Company in excess of $1,000,000 based on the average monthly revenue receipts (as a function of total revenue receipts from each client during the Valuation Period, divided by the total number of months in which revenue was received from such client during Valuation Period) for each such client during the Valuation Period (the "Lost Clients"), then the total amount of

2

revenues received by the Company during the Valuation Period from the Lost Clients (the "Lost Revenues") shall be deducted from the amount of gross sales revenue included in the calculation of item (x) above and 15% of the total amount of such Lost Revenues shall be deducted from the amount of EBITDA in the calculation of item (y) above.

"Delta Unitholder" means with respect to any Delta Unit, the record holder thereof, as set forth on Schedule A.

"Delta Units" means a class of Units as provided for in this Agreement.

"Depreciation" means, for each Tax Year or relevant portion thereof, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to a Company asset.

"Effective Date" the date of this Agreement as set forth in the preamble.

"Express Business" shall mean to provide temporary personnel and professional placement services to persons of all types.

"Gain" or "Loss" means any gain or loss resulting from the sale or exchange of any asset of the Company, or from any merger or consolidation of the Company, or from any financing or refinancing of any assets or business of the Company.

"Letter of Credit" shall mean that certain irrevocable standby letter of credit to be issued by Wells Fargo Bank, N.A. for the benefit of the Company securing the funding obligations of the Beta Unitholder under the Loan Agreement.

"Liquidating Distribution" means a distribution as described in Section 6.3 hereof.

"Loan Agreement" shall mean that certain Loan Agreement by and between the Beta Unitholder and the Company dated June 22, 2006.

"Majority Vote of the Members" means the affirmative vote of a majority of the Units outstanding at such time and entitled to vote, regardless of whether those Units are represented at a meeting at which a vote will be taken, and if reference is made to a class of Units, then the affirmative vote of a majority of the Units of that class of Units outstanding at such time and entitled to vote.

"Majority Vote of the Managers" See Section 7.5.1.

"Manager Approval" means the approval of any matter by the Managers in accordance with the procedures for approval set forth in Article VII.

"Member" means each Person who is a "member" of the Company as that term is defined in the Act.

"Member Approval" means the approval of any decision or action of the Members in accordance with Article IX.

3

"Member Minimum Gain" with respect to each Member Nonrecourse Debt, means the amount of Company Minimum Gain (as determined according to Treasury Regulation Section 1.704-2(d)(1)) that would result if such Member Nonrecourse Debt were treated as a nonrecourse liability, determined in accordance with Treasury Regulation Section 1.704-2(i)(3).

"Member Nonrecourse Debt" has the meaning set forth in Treasury Regulation Section 1.704-2(b)(4), substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires.

"Member Nonrecourse Deduction" has the meaning set forth in Treasury Regulation Section 1.704-2(i), substituting the term "Member" for the term "partner" as the context requires.

"Membership Interest" means a Member's limited liability company membership interest in the Company, represented by one or more Units held by the Member.

"Net Income" and "Net Loss" have the meaning set forth in Section 4.3.3.

"Nonrecourse Deduction" has the meaning set forth in Treasury Regulation Section 1.704-2(b) (substituting the term "Company" for the term "partnership" as the context requires).

"Payoff" shall mean the date on which (i) that certain First Amended and Restated Promissory Note dated October 1, 2006 , made by the Company in favor of the Beta Unitholder, in the principal amount of $8,060,000, is paid in full.

"Percentage Interest" means, with respect to any Member as of the time referred to herein, that Member's Membership Interest in the Company expressed as a percentage determined by dividing the total number of issued and outstanding Units in the Company into the number of Units owned by that Member.

"Person" means any natural person or legal entity.

"Required Vote" shall mean the affirmative vote of the Beta Unitholders as well as the affirmative vote of all the following Delta Unitholders:  Snipes Management LLC, Barry D. Bloom and Thomas N. Richards.

"Tax Year" means the Company's taxable year ending on or about December 31.

"Transfer" any tense of the word transfer, whether or not capitalized, when used in connection with the transfer of Units, shall include, without limitation, any transfer by sale, gift, pledge, foreclosure, exchange, grant of a security interest, distribution, or conversion, or other form of conveyance, whether voluntarily or by operation of law, during lifetime or at death.  In the event any Unit is permissibly owned hereunder by a trust or similar such entity, and then pursuant to the terms of that trust, or by operation of law, or through the exercise of any discretionary power or otherwise, any Unit is distributed by that trust to any Person, or any Person becomes a beneficiary of that trust or otherwise acquires an interest in that trust, then there shall be deemed to have occurred a transfer hereunder to that Person.

4

"Treasury Regulations" means the final, temporary, or proposed regulations of the Department of the Treasury.

"Unit" means a unit of Membership Interest of a Member in the Company, as provided for in this Agreement.

"Unitholder" means with respect to any Unit, the record holder thereof as set forth on Schedule A.

1.2    Other Definitional Provisions.  Capitalized terms used in this Agreement that are not defined in this Article I have the meanings contained elsewhere in this Agreement.

ARTICLE II
FORMATION AND PURPOSE; RESTRICTIVE COVENANTS

2.1    Formation. The Articles of Organization were prepared, executed and filed with the Secretary of State of the State of Nevada.  This Agreement shall constitute the "Operating Agreement" (as that term is used in the Act) of the Company.  The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Act and this Agreement.  To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2    Name.  The name of the Company is "Claimetrics Management, LLC."

2.3    Registered Office and Registered Agent.   The Company shall maintain a registered office in the State of Nevada at 6100 Neil Road, Suite 500, Reno, NV 89511.  The name and address of the Company's registered agent for service of process on the Company in the State of Nevada is the Corporation Trust Company of Nevada, 6100 Neil Road, Suite 500, Reno, NV 89511.

2.4    Term.  The term of existence of the Company shall be perpetual, unless the Company is sooner dissolved in accordance with the provisions of this Agreement.

2.5    Purposes and Powers.  The nature of the business and the purpose of the Company shall be to act as agent, adjuster and third party administrator for insurance companies and employers in the service of accident and health, property, casualty, workers' compensation, surety, fire, marine, vehicle and any and all other lines of insurance; to apply for, acquire, and hold all licenses, permits, and franchises necessary or useful in the pursuit of said purposes and to engage in all activities reasonably necessary in and incidental to the furtherance of its said purposes not otherwise prohibited by law.

2.6    Obligations With Respect to the Letter of Credit. The Beta Member shall procure and provide the Letter of Credit for the benefit of the Company.  The Letter of Credit will be issued in an amount no less than the maximum aggregate amount of loans yet to be made under the Loan Agreement and will automatically renew at the appropriate amount so long as the Company is not in default under the Loan Agreement. The Letter of Credit will provide that the

5

Company will reimburse the Beta Member annual costs of procuring the Letter of Credit at market rates.

    2.7   <u>Restrictive Covenants</u>.

      2.7.1  <u>Covenant Not to Compete</u>.  Each Member agrees that the Company shall conduct its Business throughout the world (the "<u>Area</u>").  Each Member agrees that, for so long as such Member or any Affiliate of such Member owns a Membership Interest (or any other economic interest in the Company), neither that Member nor any Affiliate of that Member shall, directly or indirectly: (i) anywhere in the Area own, manage, operate, join, advise, control, or otherwise engage or participate in or be connected as a partner, member, investor, stockholder, creditor, guarantor, advisor, employee, or consultant in any business that provides third-party administrative services for the implementation of insurance plans for businesses, or (ii) on his own account or for any other Person solicit, induce, or attempt to solicit or induce any employee of the Company to leave the employment of the Company or to breach his or her employment agreement with the Company.  The covenant provided in this <u>Section 2.7.1</u> shall continue for a period of one (1) year following the date on which a Member or any Affiliate of such Member owned a Membership Interest (or other economic interest in the Company) in the event that such Member's entire Membership Interest in the Company is purchased under the provisions set forth in <u>Sections 10.6 or 11.1(a)</u> of this Agreement.  Ownership by a Member of less than five percent (5%) of the publicly-traded securities of any corporation engaged in the business described above shall not constitute a violation of this provision.  In addition, it is expressly agreed and understood that Express Services, Inc., Snipes Management, LLC, Integrated Strategies, LLC and Thomas N. Richards shall not be considered to be in violation of this <u>Section 2.7.1</u> due to their involvement in the current business operations of Hallmark Management, LLC.

      2.7.2  <u>Remedies</u>.  The remedy at law for any breach of this noncompetition provision is and will be inadequate and, in the event of a breach or threatened breach by a Member or an Affiliate of a Member, the Company or another non-breaching Member shall be entitled, without the posting of a bond, to an injunction restraining such breaching Member from any breach or threatened breach hereof.  Nothing herein shall be construed as prohibiting the Company or a non-breaching Member from contemporaneously pursuing any other remedies available for such breach or threatened breach, including the recovery of damages.

      2.7.3  <u>Business Opportunities</u>.  Each Member agrees that if such Member learns (whether in the course of the Company's Business or otherwise) of a business opportunity potentially valuable to the Company's Business but which involves a business which directly competes with the Business, such Member shall promptly disclose the opportunity to the Company, with copies of such disclosure to all of the other Members, and shall not exploit the opportunity for the Member's personal benefit, whether directly or indirectly, unless (i) within thirty (30) business days after receiving notice of the opportunity, the Company rejects it, or (ii) after accepting it, the Company fails to exploit it with reasonable promptness and diligence.  Whether the Company shall accept the opportunity shall be decided in each case by a Required Vote of Members.

      2.7.4  <u>Separate Covenants</u>.  The provisions of this <u>Section 2.7</u> shall be deemed to consist of a series of separate covenants.  Each Member agrees that the character, duration, and

6

geographical scope of the provisions of this <u>Section 2.7</u> are reasonable. However, should a determination nonetheless be made by a court of competent jurisdiction or other tribunal at a later date that the character, duration, or geographical scope of such provisions is unreasonable, then it is the intention and the agreement of the Company and the Members that such provisions shall be construed by the court in such a manner as to impose only those restrictions on the conduct of the Members that are reasonable in light of the circumstances as they then exist and as are necessary to assure the Company of the intended benefit of noncompetition and confidentiality by the Members. If, in any judicial or other legal proceeding, a court or other tribunal shall refuse to enforce all of the separate covenants included herein because they are more extensive than necessary to assure the Company of the intended benefit of noncompetition and confidentiality by the Members, then those covenants that, if eliminated, would permit the remaining separate covenants to be enforced in such proceeding shall, for the purpose of such proceeding, be deemed eliminated from this Agreement.

2.7.5 <u>Severability</u>. If any of the provisions of this <u>Section 2.7</u> shall otherwise contravene or be invalid under the laws of any state or other jurisdiction where it is applicable but for such contravention or invalidity, such contravention or invalidity shall not invalidate all of the provisions of this Agreement, but rather this Agreement shall be construed, insofar as the laws of the state or jurisdiction are concerned, as not containing the provision or provisions contravening or invalid under the laws of that state or jurisdiction, and the rights and obligations created hereby shall be construed and enforced accordingly.

ARTICLE III
AUTHORIZATION AND DESCRIPTION OF UNITS

3.1 <u>Units Generally</u>. The Membership Interests of the Members shall be represented by issued and outstanding Units. The Units shall be divided into one class of Beta Units and one class of Delta Units, having such terms described in this Agreement. The Members shall have no interest in the Company other than the Membership Interests conferred by this Agreement and represented by the Units. The ownership of a Unit shall not entitle a Member to a partition or division of any property of the Company.

3.2 <u>Authorization and Issuance of Units</u>. The Company hereby authorizes and issues that number of Units, in such class, and to such Members as set forth on <u>Schedule A</u>. The Managers will revise Schedule A from time to time to reflect any changes in the ownership or classification of the Units made in accordance with this Agreement.

3.3 <u>Unit Certificates</u>. Ownership of Units shall be evidenced by Unit Certificates. Each Unit Certificate shall be signed by a Manager of the Company, certifying the number and class of Units owned by the holder of such Units. All certificates for each type and class of Units shall be consecutively numbered or otherwise identified. The names of the Members to whom the Units are issued, with the number and class of Units and date of issue, shall be entered on the books of the Company. Units shall only be transferred on the books of the Company by the holder of record or by such holder's attorney duly authorized in writing, upon surrender to the Company of the Unit Certificate(s) for such Units endorsed by the appropriate Person(s), with such evidence of the authenticity of such endorsement, transfer, authorization, and other matters as the Company may require. In that event, provided all other conditions to transfer have been

7

met, the Company shall issue a new Unit Certificate to the Person entitled thereto, cancel the old certificate(s), and record the transaction on its books (including the Member Schedule).

3.4    New Members from the Issuance of Units.  In order for a Person who is not already a Member to be admitted as a Member of the Company pursuant to the issuance of Units to such Person, such Person shall have executed and delivered to the Managers a written undertaking to be bound by the terms and conditions of this Agreement in the form approved by the Managers. Upon the satisfaction of any other applicable conditions, including the receipt by the Company of payment for the issuance of the Units, such Person shall be admitted as a Member.

ARTICLE IV
CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS

4.1    Initial Capital Contributions.  Each Member shall make a Capital Contribution to the Company in cash in an amount equal to $0.01 times the number of Units issued to that Member.

4.2    Additional Capital Contributions.  The Managers do not presently anticipate that the Company will need additional Capital Contributions from its Members. However, in the event the Managers determine that the Company does need additional capital, then the Managers may notify the Members of a plan for raising additional capital. This plan will describe the proposed sources of the additional capital, the terms upon which the additional capital will be raised, the proposed uses of the additional capital, and the consequences if any Member fails to make an additional Capital Contribution. The additional capital may be in the form of equity or indebtedness and may be raised from existing Members, newly admitted Members, or from others. If additional Capital Contributions are made in a ratio other than in the Percentage Interests of the Members, then the Percentage Interests of all the Members shall be redetermined at that time in accordance with the plan. Any such plan must be approved by a Required Vote.

4.3    Capital Accounts.

4.3.1    Maintenance Rules.  The Company shall maintain for each Member a separate capital account in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

4.3.2    Capital Account Adjustments.  Upon the contribution of money or other property (other than a de minimis amount) to the Company by an existing Member or by a newly admitted Member, or upon the distribution of money or other property (other than a de minimis amount) to a Member, or upon any transfer of any Unit by a Member, the Book Value of the assets of the Company may, if the Managers determine to do so, be adjusted to fair market value, and the Capital Account of each Member shall then be adjusted accordingly. Such adjustments may be made only if it is determined that they are in accordance with sound financial accounting principles. No such capital account adjustment shall be made if such adjustment would be impermissible under §1.704-1(b) of the Treasury Regulations.

8

4.3.3  <u>Definition of Net Income and Net Loss</u>.  "<u>Net Income</u>" and "<u>Net Loss</u>" mean, for each Tax Year or other period, an amount equal to the Company's taxable income or loss for such Tax Year or other period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)  Net Income shall include tax-exempt income described in Code §705(a)(1)(B), and Net Loss shall be included as deductible items those expenditures described in Treasury Regulation Section 1.704-1(b)(2)(iv) and Code §705(a)(2)(B).

(b)  If the Book Value of any Company property is adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(e) or (f), the amount of such adjustment shall be taken into account as Gain or Loss from the sale or exchange of such property.

(c)  Items of income, Gain, Loss or deduction attributable to the sale or exchange of Company property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the Book Value of such property.

(d)  Depreciation with respect to Company property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g).

(e)  To the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Sections 732(d), 734(b) or 743(b) is made pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of Gain (if the adjustment increases the basis of the asset) or Loss (if the adjustment decreases such basis).

(f)  If and to the extent that there are any special allocations of any item or items of income, Gain, Loss or deduction hereunder, then Net Income and Net Loss shall be computed by excluding those specially allocated items.

4.4  <u>Negative Capital Accounts</u>.  If any Member has an Adjusted Capital Account Deficit, such Member shall have no obligation to restore such deficit or to make any Capital Contributions to the Company by reason thereof, unless the Member agrees in writing to do so, and such deficit shall not be considered an asset of the Company or of any Member.

4.5  <u>No Withdrawal</u>.  No Member shall be entitled to withdraw any part of its Capital Contribution or Capital Account or to receive any distribution from the Company, except as expressly provided herein.

4.6  <u>Loans From Members</u>.  Loans by Members to the Company shall not be considered Capital Contributions.

4.7  <u>Status of Capital Contributions</u>.

9

4.7.1  No Member shall receive any interest, salary or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise specifically provided in this Agreement.

4.7.2  Except as otherwise provided herein and by applicable state law, no Member shall be required to lend any funds to the Company or to make any additional Capital Contributions to the Company. No Member shall have any personal liability for the repayment of any Capital Contribution of any other Member.

4.8  Capital Account Adjustments Upon Distributions of Property in Kind.  The Company shall determine the fair market value of any Company asset distributed in kind, and shall credit or charge to the capital account of each Member the Gain or Loss that would have been credited or charged to such Member if that asset had been sold at its fair market value as of the date of distribution.  Any such Gain or Loss that would have been recognized by the Company from such a deemed sale shall be allocated among the Members as provided for in Article IV, and the distribution shall be treated as though the Company had distributed cash equal to the fair market value of the asset so distributed in kind.

ARTICLE V
ALLOCATIONS OF NET INCOME AND NET LOSS

5.1  Sharing and Classification of Items.  This Article V shall govern the allocation of all Company items for both capital account maintenance and income tax purposes.

5.2  Allocation of Net Income, Net Loss, and Gain or Loss.  For Capital Account maintenance purposes, all Net Income, Net Loss, and Gain or Loss will be allocated each Tax Year as follows:

5.2.1  Prior to Payoff, all Net Loss shall be allocated to the Beta Unitholder.

5.2.2  Prior to Payoff, all Net Income shall be allocated to the Beta Unitholder until such time, if ever, as the amount of Net Income allocated to the Beta Unitholder equals the amount of Net Loss, if any, previously allocated to the Beta Unitholder.  All other Net Income and Net Loss shall be allocated among the Members in accordance with their Percentage Interests.

5.2.3  Any Gain or Loss shall be allocated in a manner which will cause or tend to cause the relative Capital Account balances of the Members to be in the same ratios as their Percentage Interests.

5.2.4  Any remaining Gain or Loss shall be allocated among the Members in accordance with their Percentage Interests.

5.3  Change in Percentage Interests.  In the event that there are any changes in the Percentage Interests of the Members (whether arising out of additional Capital Contributions by one or more Members, the liquidation of all or a part of a Member's Units, transfers of Units between or among the Members, or otherwise) then the Net Income and Net Loss with respect to any Members whose Percentage Interests have changed during the subject period shall be

10

allocated in a manner determined by the Manager taking into account all facts and circumstances and using any method which is permissible under Section 706(d) of the Code.

    5.4   <u>Regulatory and Special Allocations.</u>   Notwithstanding the provisions of Section 5.2:

    (a)   To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or 743(b) is required to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated, as provided in Treasury Regulation Section 1.704-1(b)(2)(iv)(*m*), as an item of income (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such income or Loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations.

    (b)   If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulation Section 1.704-2(d)(1)) during any Tax Year, each Member shall be specially allocated income for such Tax Year (and, if necessary, subsequent Tax Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulation Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulation Sections 1.704-2(f)(6) and 1.704-2(j)(2). This paragraph is intended to comply with the minimum gain chargeback requirement in Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

    (c)   Member Nonrecourse Deductions shall be allocated in the manner required by Treasury Regulation Section 1.704-2(i). Except as otherwise provided in Treasury Regulation Section 1.704-2(i)(4), if there is a net decrease in Member Minimum Gain during any Tax Year, each Member that has any Member Minimum Gain shall be specially allocated income for such Tax Year (and, if necessary, subsequent Tax Years) in an amount equal to the net decrease in that Member's Minimum Gain. Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulation Sections 1.704-2(i)(4) and 1.704-2(j)(2). This paragraph is intended to comply with the minimum gain chargeback requirements in Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

    (d)   In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), income shall be specially allocated to such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustments, allocations or distributions as quickly as possible. This paragraph is intended to comply with the qualified income offset requirement in Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

    (e)   The allocations set forth in paragraphs (a), (b), (c) and (d) above (the "<u>Regulatory Allocations</u>") are intended to comply with certain requirements of the Treasury Regulations under Code Section 704. Notwithstanding any other provisions of

11

this Article 5 (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating income and Losses among Members so that, to the extent possible, the net amount of such allocations of Profits and Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

5.5    Curative Allocations.  If the Managers determine, after consultation with counsel experienced in income tax matters, that the allocation of any item of Company income, Gain, Loss, deduction or credit is not provided for in this Article 5 (an "unallocated item"), or that the allocation of any item of Company income, Gain, Loss, deduction or credit hereunder is clearly inconsistent with the Members' economic interests in the Company (determined by reference to the general principles of Treasury Regulation Section 1.704-1(b) and the factors set forth in Treasury Regulation Section 1.704-1(b)(3)(ii)) (a "misallocated item"), then the Managers may allocate such unallocated items, or reallocate such misallocated items, to reflect such economic interests; provided that no such allocation will be made without the prior consent of each Member that would be adversely affected thereby (which consent no Member may unreasonably withhold) and provided further that no such allocation shall have any material effect on the amounts distributable to any Member, including the amounts to be distributed upon liquidation of the Company.

5.6    Tax Allocations.

(a)    All items of income, Gain, Loss, and deduction of the Company shall be allocated for income tax purposes among the Members in accordance with the allocations among the Members for computing their Capital Accounts, except that if any such allocation for tax purposes is not permitted by the Code or other applicable law, then the allocation shall be made so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

(b)    Items of Company income, Gain, Loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) and the traditional method of Treasury Regulation Section 1.704-3(b) so as to take into account of any variation between the adjusted tax basis of such property and its Book Value.

(c)    If the Book Value of any Company property is adjusted as permitted herein or under the Treasury Regulations, subsequent allocations of items of income, Gain, Loss and deduction with respect to such property shall take account of any variation between the adjusted basis of such property for federal income tax purposes and its Company Value in the same manner as under Code Section 704(c).

(d)    Allocations of tax credit, tax credit recapture, and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Board taking into account the principles of Treasury Regulation Section 1.704-1(b)(4)(ii).

12

ARTICLE VI
DISTRIBUTIONS

6.1     Mandatory Distributions.  Following Payoff, the Company shall distribute, on or before January 31st of each calendar year, a cash amount to the Members in proportion to their respective Percentage Interests sufficient to allow the Members to pay applicable federal and state income taxes on, and any estimated tax underpayment penalties directly resulting from, the Members' distributive share of Net Income for the preceding calendar year.  For purposes of computing such distributions, the Managers may use any method which they deem in their good faith judgment to be reasonable and appropriate, and the Managers are not required to inquire into the personal income tax circumstances of any of the Members.  The parties contemplate that the Managers shall assume that each of the Members is required to pay income tax at the top federal and applicable state marginal income tax rates.

6.2     Discretionary Distributions of Cash Flow.  At any time following Payoff, the Managers will from time to time, in the Managers' discretion, distribute Cash Flow to the Members in proportion to their respective Percentage Interests.

6.3     Liquidating Distributions.  A liquidating distribution shall be any distribution which is determined by the Managers to be in liquidation or in partial liquidation of any of the assets of the Company.  All liquidating distributions will be made to the Members in accordance with and to the extent of their relative Capital Account balances.

6.4     Restrictions on Distributions.  Notwithstanding anything to the contrary herein, no distribution shall be made if the distribution is prohibited by the Act or if, after giving effect to the distribution, the Company would not be able to pay its debts as they become due in the usual course of business or where the Company's total assets would be less than the sum of its total liabilities.

6.5     No Duty to Make Distributions.  The Company shall have no duty to make distributions except as expressly provided in this Agreement.

ARTICLE VII
MANAGEMENT

7.1     The Board of Managers.  The Company shall be managed by a Board of Managers (sometimes referred to as the "Board" or the "Managers").  The Board of Managers shall consist of that number of Persons (the "Managers") as the Board from time to time determines appropriate, except that there shall always be an odd number and not an even number of Managers.  The Delta Unitholders shall have the right by a Majority of the Delta Unitholders to appoint two (2) Managers (each, a "Delta Manager"), with each Delta Manager entitled to one vote.  The Beta Unitholders shall have the right to appoint up to three (3) and not less than one (1) Manager (the "Beta Managers"), with the Beta Manager(s) collectively entitled to three votes.  The Beta Unitholders appoint Thomas N. Richards as an initial Manager and the Delta Unitholders appoint A. Marshall Snipes and Barry D. Bloom as initial Managers.  The Delta Unitholders or the Beta Unitholders may at any time upon notice to the Company replace any Manager appointed by that class of Unitholders to the Board or fill a vacancy if any Manager

13

appointed by that class of Unitholders fails to continue to serve for any reason. The holder of each such class of Unitholders may exercise their rights hereunder by notice to the Company signed by the holders of a Majority Vote of the then outstanding Units of that class and stating that such matter has been approved or decided by an affirmative vote of 80% of the Members of that Class of Units.

7.2    Duties and Powers of the Board of Managers.    Except as may otherwise be expressly provided herein, the Managers shall have the exclusive powers and duties to manage and control all business and affairs of the Company and to make all decisions for and on behalf of the Company.

7.3    Chairman and Secretary.    The Managers shall elect a Chairman and a Secretary, and may elect a Vice-Chairman or such other officers as the Managers deem appropriate. Each meeting of the Managers shall be presided over by the Chairman, or in his or her absence, by such Manager as shall be chosen at the meeting.

7.4    Meetings.

7.4.1    Regular Meetings.    The Managers shall establish times, places, and dates for regular meetings of the Managers. Each Manager shall be given notice by the Managers of the time, place, and date of the regularly scheduled meetings. No other notice shall be required for any regularly scheduled meeting.

7.4.2    Special Meetings.    A special meeting of the Managers may be called by the Chairman at any time. A special meeting of the Managers shall be called by the Chairman upon the request of any two Managers. If the Chairman fails or refuses to call a special meeting upon the request of any two Managers, then the two Managers may call the special meeting. All Managers shall receive not less than three (3) business days notice of the time and date of a special meeting. All special meetings shall be held at the Company's principal place of business, unless the Managers agree otherwise by unanimous vote.

7.4.3    Meeting by Telephone.    Managers may participate in a meeting of the Managers or of any committee by means of conference telephone or similar communications equipment by means of which all Managers participating in the meeting can hear each other. Such participation shall constitute presence in person at such meeting.

7.5    Voting.

7.5.1    Manager Approval.    At any meeting of the Managers, the Manager or Managers appointed by the Delta Unitholders shall collectively have two votes and the Managers appointed by the Beta Unitholders shall collectively have three votes. A matter shall have Manager Approval if it is approved by three votes.

7.5.2    Proxies and Temporary Appointments.    Voting by proxy shall not be permitted. However, if any Manager appointed by a Member is not in attendance at a meeting, that Member may nevertheless appoint another individual Person to attend the meeting as a temporary Manager for that Member, so long as that Member causes to be presented to the

14

Managers, at the beginning of or prior to the meeting, a written authorization which is signed by the Member and which clearly and unambiguously appoints that Person to serve as a temporary Manager for that meeting.

      7.5.3  <u>Action Without a Meeting</u>. Any action of the Managers may be taken by written consent without a meeting, but only if such consent is in writing, sets forth the action so taken, and is signed by all of the Managers.

      7.6  <u>Restrictions on Authority</u>. Notwithstanding any provisions of this Agreement to the contrary, without first obtaining the affirmative vote of one or more Members having between or among them more than seventy percent (70%) of the Percentage Interests, the Managers shall not, on behalf of or in the name of the Company: (i) sell (except upon a dissolution pursuant to Article X), convey, encumber or refinance all or substantially all of the property of the Company; (ii) distribute or utilize insurance proceeds received upon the total or substantial destruction of the Company's property in a manner other than which may be dictated by any relevant loan agreements or other such documentation; (iii) file a petition in bankruptcy or execute or deliver an assignment for the benefit of the creditors of the Company; (iv) lend to any Person any of the funds of the Company; (v) institute any legal or administrative action by or on behalf of the Company or compromise or settle any claim of the Company of more than $50,000 or for less than the face amount of such claim; (vi) issue any additional Membership Interests of any class, any securities convertible into Membership Interests, or any warrants or options, or take any action which reduces the Percentage Interest of any Member; (vii) sell, license or exploit any intellectual property of the Company outside of the normal operations of the Company's Business; (viii) confess a judgment against the Company; (ix) do any act which would make it impracticable to carry on the ordinary business of the Company; (x) knowingly perform any act which would subject a Member to personal liability; (xi) merge, convert, or consolidate the Company with or into any Person; (xii) purchase, sell or lease any assets, materials, supplies, inventory or services of the Company in excess of $250,000; (xiii) incur an expenditure of more than $250,000 or any expenditure which would, when aggregated with all previous expenditures in any fiscal quarter, cause the aggregate expenditures by the Company in such fiscal quarter to be more than $500,000, except for payments made pursuant to agreements which have been previously approved by a Required Vote or for budgeted items previously approved by a Required Vote; (xiv) amend this Agreement or the Articles of Organization of the Company; (xv) enter into any agreement or other arrangement whereby the Company provides services to a business which directly competes with the Express Business; (xvi) enter into any transaction with a Member or an Affiliate of a Member; (xvii) make any tax election permitted or required under the Code including, without limitation, elections of methods of depreciation and elections under Code Section 754; (xviii) do any act in contravention of this Agreement; or (xix) enter into any contract, deed, mortgage or other agreement committing or agreeing to do any of the foregoing.

      7.7  <u>Committees and Officers</u>. The Board shall have the power to appoint officers of the Company and delegate to those officers such powers and duties which the Board deems appropriate. The Board shall also have the power to establish one or more committees of the Board to which the Board may delegate powers and duties.

15

7.8    Execution of Instruments.  The Board shall have the power to authorize any Person to enter into and execute on behalf of the Company any instrument that may be executed by the Company.

7.9    Reports.  The Board shall make periodic reports to the Members concerning the business and financial condition and results of operation of the Company.  In addition, the Board shall provide income tax data to the Members on a timely basis sufficient to permit the Members to include their shares of all tax items from the Company on their income tax returns.  The Board shall prepare, or cause to be prepared, minutes of all meetings of the Members.  Such minutes shall be made available to all Members.  The Board shall cause to be kept at the Company's place of business the following:

(a)    a current list of the full name and last known business address of each Member and Manager;

(b)    a copy of the Articles of Organization of the Company, together with any amendments thereto;

(c)    copies of the Company's federal, state, and local income tax returns and reports, if any, for the three most recent years;

(d)    a copy of this Agreement, together with any amendments hereto; and

(e)    copies of any financial statements of the Company for the three most recent years.

7.10    Committees.  The Managers may designate one or more committees of Managers.  Any such committee shall have the powers and authority of the Managers as delegated to that committee by the Managers.

7.11    Compensation.  Managers shall not receive any compensation for their services as Managers, but shall be reimbursed for ordinary and necessary expenses incurred by them in connection with their services as Managers.  This Section 7.11 shall not apply or in any way effect the terms of an employment arrangement a Manager may have with the Company.  Furthermore, the terms of an employment arrangement a Manager may have with the Company shall be maintained as confidential by and among the Managers of the Company.

7.12    Business Records.  The Managers shall maintain all books and records of Company.  All books and records of Company shall be available for inspection at any time to any Member during regular business hours and by appointment.

7.13    Evidence of Manager's Authority.  Any Person transacting any business with the Company may transact such business with a Manager, acting on behalf of the Company, without necessity for inquiring into the authority of a Manager to act on behalf of the Company, unless the Manager does not have actual authority to act on behalf of the Company with respect to that particular business and that Person has knowledge of the fact that the Manager lacks such authority.  The Company may from time to time prepare a certificate or designation of authority or similar type document which may be used by a Manager when transacting business of the

16

Company. When a Manager executes any document on behalf of the Company, the Manager may do so by signing his or her name, followed by the word "Manager."

7.14 <u>Liability and Indemnity</u>. In any threatened, pending, or completed action, suit, or investigation in which any Manager is or was a party by virtue of his status as a Manager, the Company shall, solely from the Company's assets, indemnify the Manager against any costs, expenses, or damages actually and reasonably incurred by that Manager, so long as the Manager acted in a manner which was prudent, reasonable, in good faith, and generally in the best interests of the Company and the Members, and so long as the Manager did not violate his fiduciary duty to the Company. However, nothing contained herein shall limit the liability of a Manager for any breach of the Manager's duty of loyalty to the Company or its Members, or for acts or omissions not in good faith or which involve misconduct or a violation of law, or for any transaction from which the Manager or any affiliate of the Manager derived an improper personal benefit.

## ARTICLE VIII
## RIGHTS AND OBLIGATIONS OF MEMBERS

8.1 <u>Limitation of Liability</u>. Each Member's liability shall be limited to the maximum extent permitted by the Act and any other applicable law, except to the extent that such Member agrees in writing to any such liability.

8.2 <u>Restrictions on Power to Bind the Company</u>. Except as otherwise provided herein, no Member shall have the authority or power to act on behalf of or to bind the Company or any other Member or to take any action which would adversely affect the limited liability of a Member or affect the status of the Company as a partnership for federal income tax purposes.

8.3 <u>No Withdrawal By a Member</u>. Nothing in this Agreement provides any right or power of a Member to withdraw voluntarily from the Company.

8.4 <u>Defaulting Member</u>. Any Member who materially breaches any provision of this Agreement shall be a Defaulting Member. The Company and each nondefaulting Member shall have the right to exercise any and all remedies and rights available to them to enforce the Defaulting Member's obligations hereunder, and the Defaulting Member shall indemnify and hold harmless the Company and each other Member and each Manager (each, an "<u>Indemnified Party</u>") for any costs, expenses, damages, losses or injury suffered by any such Indemnified Party resulting from or arising out of the breach by the Defaulting Member.

## ARTICLE IX
## MEETINGS OF MEMBERS

A meeting of the Members for the purpose of transacting any business as may come before the meeting may be held at such place, on such date and at such time as may be called by the Board. The Board shall determine all rules and procedures with respect to any meeting of Members. No annual or special meeting of Members shall be required, unless called by the Board. At any meeting of Members, the Managers appointed by each Member of each Member shall be invited to attend

17

ARTICLE X
TRANSFER OF UNITS

10.1 <u>General Restrictions on Transfers</u>. Except as otherwise permitted in this Agreement, no Member may make or suffer to be made any Transfer of all or any part of that Member's Units to any Person. Except as set forth herein, any purported Transfer other than as permitted in this Article X shall be null and void and shall not be respected in any manner by the Company.

10.2 <u>Permitted Transfers</u>. The following Transfers described in this <u>Section 10.2</u> shall be permitted Transfers. Any Person to whom a Unit is Transferred as permitted hereunder is referred to as a "<u>Permitted Transferee</u>." However, any permitted Transfer hereunder shall be effective only upon compliance with the requirements of <u>Section 10.4</u>. Any Permitted Transferee hereunder may become a Member of the Company upon compliance with <u>Section 10.5</u>.

(a)    All or any number of a Member's Units may be transferred by a Member to (i) a revocable trust having the transferring Member as the grantor within the meaning of Section 676(a) of the Code, or (ii) a corporation, limited partnership, limited liabililty company or other similar entity of which the transferring Member owns 100% of the then outstanding capital stock.

(b)    A Member may transfer Units pursuant to the procedures set forth in Section 10.3.

10.3 <u>Permitted Transfer Upon Right of First Refusal, Co-Sale Rights and Drag-Along Rights</u>. Any Member (herein called a "<u>Transferring Member</u>") receiving a bona fide offer (a "<u>Purchase Offer</u>") to Transfer all or any number of that Member's Units, other than as expressly permitted under this Agreement, may do so only upon compliance with all of the following provisions.

(a)    <u>Transfer Notice</u>.    The Transferring Member shall give notice (the "<u>Transfer Notice</u>") of the Purchase Offer to the other Members (collectively, the "<u>Nontransferring Members</u>", and individually, a "<u>Nontransferring Member</u>") and to the Company, which Transfer Notice shall specify (i) the number and class of Units proposed to be Transferred (the "<u>Offered Units</u>"); (ii) the selling price, which must be payable in cash; (iii) the identity of the Purchase Offeror; (iv) the proposed terms of payment; (v) suitable evidence of the Purchase Offeror's ability to pay for the Offered Units; and (vi) all other material terms of the Purchase Offer. The Transfer Notice shall also include a copy of the Purchase Offer. The Transfer Notice shall be dated and given to all of the Nontransferring Members and to the Company at approximately the same time and shall list all of the Nontransferring Members to whom the Transfer Notice is being given.

(b)    <u>Option to Purchase</u>. Each of the Nontransferring Members shall have the right to purchase any portion, up to its Proportionate Percentage, of the Offered Units at the same price and on the same terms and conditions as contained in the Purchase Offer, by giving written notice of acceptance (an "<u>Acceptance Notice</u>") to the Transferring

18

Member and to the Company (with a copy to the other Nontransferring Members) within twenty (20) days from the last date on which all Nontransferring Members received the Transfer Notice. The Acceptance Notice shall state the amount of Offered Units which the party giving the Acceptance Notice elects to purchase. For purposes of this Section, the "Proportionate Percentage" of a Nontransferring Member shall be a fraction, expressed as a percentage equal to (i) the number of Units owned by such Member if the Member is then entitled to purchase the Offered Units, divided by (ii) the aggregate number of Units owned by all of the Members then entitled to purchase the Offered Units.

(c)    Reoffer to Certain Members.   To the extent that any Nontransferring Member does not provide for the purchase of its entire Proportionate Percentage of the Offered Units, then the other Nontransferring Members whose Acceptance Notices do so provide shall have the right to purchase a portion of the Offered Units not then subject to an Acceptance Notice based upon their relative Proportionate Percentages. The Managers shall notify each such Nontransferring Member of its right to purchase any such Offered Units and the number of the Offered Units which may be elected for purchase. Each such Nontransferring Member shall then have the right to give an Acceptance Notice to the Transferring Member and to the Company of such Nontransferring Member's election to purchase such Nontransferring Member's Proportionate Percentage of the remaining Offered Units. If there still remains any Offered Units not subject to an Acceptance Notice, then the remaining Offered Units shall be reoffered to the Nontransferring Members who have given Acceptance Notices as to their full Proportionate Percentage of the Offered Units until all of Offered Units are either subject to one or more Acceptance Notices or, if sooner, there are no Nontransferring Members still electing to exercise their purchase rights. The Company shall set reasonable time deadlines and shall determine the procedure to be followed under this Section in order to cause the Offered Units to be reoffered to certain Nontransferring Members.   Any Nontransferring Member who fails to give an Acceptance Notice within the required offering period shall be deemed to have declined that purchase right.

(d)    Sale of Offered Units.   If, after giving effect to Section 10.3(a) through 10.3(c), all of the Offered Units are subject to an Acceptance Notice by some or all of the Nontransferring Members, then the Transferring Member shall be required to sell those Offered Units to those Nontransferring Members, and those Nontransferring Members shall be required to purchase those Offered Units from the Transferring Member in accordance with the terms of the Purchase Offer and the Transfer Notice. If all of the Offered Units are not subject to an Acceptance Notice by some or all of the Nontransferring Members, then the Transferring Member may at the Transferring Member's option either sell to the electing Transferring Members that number of the Offered Units that they have elected to purchase in their Acceptance Notices, in which event the Transferring Member shall sell the balance of the Offered Units to the Purchase Offeror in accordance with the terms of the Purchase Offer, or elect to sell all of the Offered Units to the Purchase Offeror in accordance with the terms of the Purchase Offer, or elect to sell none of the Offered Units whatsoever. If the Transferring Member does not consummate the sale to the Purchase Offeror within one hundred twenty (120) days

19

from the last day upon which any Nontransferring Member had a right to give an Acceptance Notice and if the Transferring Member still desires to sell the Offered Units subject to the Purchase Offer, then the Transferring Member shall be required to again give the Transfer Notice of the Purchase Offer as provided for in Section 10.3(a) and again go through the right of first refusal procedure contained in this Section 10.3.

(e)    Co-Sale Rights. In the alternative, but subject to Section 10.3(f) below, if the Transferring Member proposes to Transfer more than 50% of then outstanding Beta Units, then each Nontransferring Member may elect to sell or transfer in the contemplated transaction not less than all of the Units held by such Nontransferring Member by giving written notice thereof (a "Co-Sale Notice") within fifteen (15) days from the date on which the Nontransferring Member received the Transfer Notice. Promptly after the receipt of all Co-Sale Notices timely given, the Transferring Member will use its best efforts to cause the Purchase Offeror to amend its Purchase offer so as to provide for the Purchase Offeror's purchase, upon the same terms and conditions of payment as those contained in the Transfer Notice, of all of the Units elected to be sold in the Co-Sale Notices (the "Co-Sale Units"). In the event that such Purchase Offeror is unwilling to amend its Purchase Offer to purchase all of the Co-Sale Units in addition to Offered Units, then the Transferring Member will not be permitted to Transfer any Units to the Purchase Offeror under this Article X.

(f)    Drag-Along Rights. In the event that (i) a proposed Transfer by a Transferring Member involves all of the then outstanding Beta Units of the Company, and (ii) the Nontransferring Members do not give Acceptance Notices to purchase all of the Offered Units within the required time periods set forth in Section 10(b), then such Transferring Member, shall have the right, exercisable upon written notice to the Nontransferring Members not less than twenty (20) days prior to such Transfer, to require that such Nontransferring Members Transfer all of their Units (the "Drag-Along Units") to the Purchase Offeror at the same time and on the same terms and conditions of payment as those contained in the Transfer Notice. In the event that such Purchase Offeror is unwilling to amend its Purchase Offer to purchase all of the Drag-Along Units in addition to Offered Units, then no Members will be permitted to Transfer any Units to the Purchase Offeror under this Article X.

(g)    Rules and Procedures. Upon a Required Vote and so long as the Company gives adequate notice to all Members, the Company shall have the power to (i) adopt additional rules and procedures for the right of first refusal, co-sale and drag-along procedures set forth in this Section, or (ii) vary or amend any of the rights set forth in this Section in any reasonable manner.

10.4    Requirements to Be Satisfied as a Condition to the Transfer of Units Before Distributions May Be Made to Any Permitted Transferee. Any Permitted Transferee shall be recognized by the Company as the transferee of the transferred Units, but only if (i) the Permitted Transferee of the Units executes such documents as are satisfactory to the Company accepting and adopting this Agreement; (ii) the Transferring Member and the Permitted Transferee of the Units satisfy the Company that the Transfer is permissible under applicable state and federal securities laws and will not jeopardize the classification of the Company as a

20

partnership for income tax purposes; (iii) the Transferring Member and the Permitted Transferee of the Units satisfy the Company that the Transfer is permitted under this Agreement; and (iv) the Transferring Member and the Permitted Transferee agree to pay all expenses incurred by the Company in connection with the Transfer. The provisions of this <u>Section 10.4</u> shall not apply with respect to the Transfer of any Units to a Transferee that is a Member immediately prior to such Transfer.

10.5  <u>Permitted Transferee May Become a Member of the Company</u>.  Any Permitted Transferee of all or any part of any Units who satisfies the requirements of <u>Section 10.4</u> shall thereupon become a Member of the Company (if not already a Member).

10.6  <u>Default</u>.

(a)  <u>Events of Default</u>.  In the event (i) a Member makes an assignment, general or special, for the benefit of its creditors; (ii) a Member files any petition for discharge, arrangement, plan or any other relief under the bankruptcy laws of the United States, or of any other law of the United States or any state for the relief of debtors; (iii) the Company's property, or any portion thereof, or any interest therein, or any interest in the Company is levied upon or otherwise subjected to the claims of the creditors of a Member, or comes into the possession of a receiver appointed for a Member (except in an action to enforce a properly authorized obligation of the Company); (iv) control of the affairs of a Member in any manner comes under the jurisdiction of any court in any involuntary proceeding or action in bankruptcy, arrangement for the benefit of creditors, receivership, or other judicial or governmental action; (v) a Member or a Manager breaches any of the obligations or covenants contained in this Agreement; (vi) a Change in Control shall occur with respect to a Member or (vii) a Member transfers his Membership Interest in violation of this Article X; and in the further event that such proceeding, action or breach as set forth in (i) through (iv) above is not dismissed, discharged or cured within thirty (30) days after written notice by any other Member, such event shall be deemed to be a default of the obligations of such Member. The occurrence of an event set forth in (v) through (vii) above shall automatically be deemed to be a default of the obligations of the applicable Member.

(b)  <u>Option to Purchase</u>.  In the event a Member defaults, the remaining Members shall have the right to acquire the Membership Interest of the defaulting Member (and the defaulting Member's transferee). The remaining Members shall exercise this option by delivering written notice of such exercise to the defaulting Member or his transferee within ninety (90) days after the remaining Members receive notice of the occurrence of an event of default. Absent an agreement between or among the remaining Members, each remaining Member shall have the option to acquire his Proportionate Percentage of the Membership Interest of the defaulting Member.

(c)  <u>Effective Date</u>.  The effective date of the sale and purchase of any defaulting Member's Membership Interest (and the Membership Interest of the defaulting Member's successor or transferee) purchased hereunder shall be the last day of the month preceding the month in which the written notice of the exercise of the option to purchase such Membership Interest is delivered. Any defaulting Member or its successor or

21

transferee shall be entitled to or charged with its distributive share of Net Income and Net Losses for the fiscal year in which the sale occurs until the effective date of the sale and purchase.

    (d)   <u>Purchase Price</u>.  The purchase price for the defaulting Member's Membership Interest (and the Membership Interest of the defaulting Member's successor or transferee) shall be equal to the Percentage Interest of the defaulting Member multiplied by the Company Value, multiplied by 60%; provided, however, and subject to the redemption provisions set forth in <u>Sections 11.1(b) and 11.2</u> below, the purchase price for the Membership Interest of either (y) a Member that is in default (and the Membership Interest of that Member's successor or transferee) due to a Change of Control that has occurred as a result of the death of an individual who held, directly or indirectly, an ownership interest in the defaulting Member, or (z) the Beta Member that is in default due to a Change of Control of the Beta Member shall be equal to the Percentage Interest of such defaulting Member multiplied by the Company Value.

    (e)   <u>Payment of Purchase Price</u>.  In the event of the default of a Member and the exercise by the remaining Members of the option to purchase the Membership Interest of such defaulting Member, payment for that Member's Membership Interest shall be made by the making and delivery of negotiable promissory notes in the amounts computed to be due to the defaulting Member.  The notes shall bear interest at a rate equal to the Federal Short Term Rate determined under Section 1274(d) of the Code, in effect on the effective date.  Such interest rate shall be adjusted on each annual anniversary of the effective date to the then current Federal Short Term Rate.  The notes shall have a maturity date of five (5) years from the effective date and shall be payable in five (5) equal principal installments plus accrued interest, commencing one year after the effective date.  The makers of the note shall have the privilege of prepaying all or any portion of the principal, without penalty.  The notes shall be secured by a perfected security interest in the Membership Interest acquired from the defaulting Member.

    10.7  <u>Partial Invalidity</u>.  The Members each agree that all of the terms and provisions contained in this Article are fair and reasonable and are necessary to protect the mutual rights and interests of the Members.  However, in the event it is determined that any restriction or limitation on transferability of Units under this Article, or the right on behalf of the Members to purchase any Units so Transferred or proposed to be Transferred should be invalid or unenforceable for any reason, then that provision or those provisions herein which are determined to be invalid or unenforceable shall be reformed and amended to the minimum extent absolutely necessary to cause any such provision to be valid and enforceable.  The purpose of this provision is to prevent a determination of total invalidity or unenforceability of any such provision, since that is contrary to the intent of the Members entering into this Agreement.

    10.8  <u>Legend</u>.  The certificates or instrument representing the Units will bear the following legend:

    "THE TRANSFER OF THE UNITS REPRESENTED BY THIS CERTIFICATE OR INSTRUMENT IS SUBJECT TO THE CONDITIONS SPECIFIED IN AN OPERATING AGREEMENT AMONG THE COMPANY AND ITS MEMBERS."

22

ARTICLE XI
TERMINATION OF MEMBER'S EMPLOYMENT AND MANDATORY REDEMPTION

11.1    Termination of the Employment of Member.

(a)    <u>Termination of Employment for Cause</u>.  Immediately upon the termination of any Member's employment with the Company by the Company "with cause" or by the Member "without cause", as defined in that Member's employment agreement with the Company (a "<u>Breach Termination</u>"), all of the Units owned of record or beneficially (the "<u>Breach Units</u>") by such Member (the "<u>Breaching Member</u>") shall be deemed hereby, automatically and without any further action required on the part of the Breaching Member, to have been offered for sale (the "<u>Breach Offer</u>") by the Breaching Member to the Company on the date of the Breach Termination on the following terms and conditions:

(i)    Within 60 days of the Breach Termination (the "<u>Breach Offer Period</u>"), the Company shall notify the Breaching Member in writing (the "<u>Breach Member Notice</u>") whether or not the Company shall accept the Breach Sale Offer.

(ii)    If the Company shall accept the Breach Offer, the Breach Member Notice shall fix a closing date (the "<u>Breach Closing Date</u>") for such purchase, which shall be not more than 30 days after the expiration of the Breach Offer Period, and the Company shall purchase the Breach Units at a price (the "<u>Breach Purchase Price</u>") equal to the Percentage Interest of the Breaching Member multiplied by the Company Value of the Company, multiplied by 60%.  The Breach Purchase Price shall be paid in cash on the Breach Closing Date.

(b)    <u>Other Termination of Employment</u>.  Immediately upon the termination of any Member's employment with the Company for any reason whatsoever other than by the Company "with cause" or by the Member "without cause", as defined in that Member's employment agreement with the Company (a "<u>Non-Breach Termination</u>"), all of the Units owned of record or beneficially (the "Non-Breach Units") by such Member (the "<u>Non-Breaching Member</u>") shall be deemed hereby, automatically and without further action required on the part of the Company, to be the subject of a purchase offer (the "<u>Non-Breach Offer</u>") by the Company to the Non-Breaching Member on the date of the Non-Breach Termination on the following terms and conditions:

(i)    Within three (3) years of the Non-Breach Termination (the "<u>Non-Breach Offer Period</u>"), the Non-Breaching Member shall notify the Company in writing (the "<u>Non-Breach Company Notice</u>") whether or not the Member shall accept the Non-Breach Offer.

(ii)    If the Member shall accept the Non-Breach Offer, the Non-Breach Company Notice shall fix a closing date (the "<u>Non-Breach Closing Date</u>") for such purchase which shall not be more than 30 days after the receipt of the Non-Breach Company Notice, and the Company shall purchase the Non-Breach Units at a price (the "<u>Non-Breach Purchase Price</u>") equal to the Percentage Interest of

23

the Non-Breaching Member multiplied by the Company Value of the Company as of the date of the Non-Breach Company Notice. The Non-Breach Purchase Price shall be paid in cash on the Non-Breach Closing Date.

11.2    <u>Mandatory Redemption.</u>

(a)    <u>Redemption Right</u>. Beginning on January 1, 2010, each Unitholder that is not otherwise in default under this Agreement as provided in <u>Section 10.6</u> shall have the option to require the Company to redeem the Units held by such Unitholder at the applicable per Unit price (the "<u>Redemption Price</u>") specified in <u>Section 11.2(b)</u> below. A Unitholder may exercise the Redemption Option by giving written notice to the Company of the election of such Unitholder to require redemption (the "<u>Redemption Notice</u>"). The Redemption Notice shall cover all of the Units held by the electing Unitholder. The Units of the electing Unitholder shall be redeemed in five (5) equal annual installments, the first installment being due on the sixtieth (60th) day following the date of the Redemption Notice and the subsequent installments being due within sixty (60) days following each annual anniversary of the Redemption Notice. The total Redemption Price for each annual installment shall be paid by the Company's delivery of a certified check or wire transfer, but shall be contingent upon the electing Unitholder's delivery to the Company of a certificate or certificates representing the corresponding Units to be redeemed. Until the Units of the electing Unitholder have been redeemed in full, the electing Unitholder shall continue to be, and shall have all of the rights of a Unitholder with respect to the unredeemed Units held by such Unitholder. Notwithstanding anything contained herein to the contrary, it is expressly agreed and understood that the Beta Member may avail itself of the redemption rights provided in this <u>Section 11.2</u> even if the Beta Member is in default under this Agreement due to a Change of Control that has occurred with respect to the Beta Member.

(b)    <u>Redemption Price</u>. The Redemption Price per Unit shall be the Company Value divided by the total number of then outstanding Units of the Company.

(c)    <u>Redemption from Cash Flow</u>. All Members agree and acknowledge that Redemption Price installments shall only be made from available Cash Flow. If available Cash Flow on any date on which Redemption Price installments are due is insufficient to redeem the total number of Units to be redeemed on such date, that Cash Flow which is available will be used to redeem the maximum possible number of Units and if, on such payment date, the Redemption Price installments are due to more than one electing Unitholder, the available Cash Flow for redemption will be paid ratably among the Unitholders of such Units to be redeemed based on each Unitholder's proportionate percentage of the aggregate number of Units to be redeemed. The Units not redeemed shall remain outstanding and entitled to all rights provided herein. At any time thereafter when additional Cash Flow is available for redemption of Units, such Cash Flow will immediately be used to redeem the balance of the Units which the Company has become obligated to redeem but which have not been redeemed.

(d)    <u>Prepayment of Redemption Price Installments</u>.    At the option of the Company and provided there is sufficient Cash Flow, the Company may elect to prepay

all or any portion of Redemption Price installments due an electing Unitholder. If there is more than one electing Unitholder at the time of the Company's prepayment election, the prepayment shall be made to all then eligible electing Unitholders. If the Company's prepayment election is made with respect to only a portion of future Redemption Price installments or if available Cash Flow is insufficient to prepay all Redemption Price installments owed to then eligible electing Unitholders, the prepayment shall be paid ratably to the Unitholders based on each Unitholders proportionate percentage of the aggregate number of Units to be redeemed.

ARTICLE XII
DISSOLUTION AND LIQUIDATION

12.1 <u>Dissolution</u>.   The Company shall be dissolved and liquidated upon the decision by a Required Vote to do so. However, the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided for herein.

12.2 <u>Liquidation</u>.

(a)     Upon dissolution of the Company, a liquidator or liquidating committee appointed by the Managers shall be the liquidator (the "<u>Liquidator</u>"). The Liquidator shall be entitled to receive such compensation for its services as may be approved by the Managers. Except as expressly provided in this Article XII, the Liquidator shall have and may exercise all of the powers necessary or desirable in the good faith judgment of the Liquidator to carry out the duties and functions of the Liquidator hereunder for and during such period of time as shall be reasonably required in the good faith judgment of the Liquidator to complete the winding up and liquidation of the Company as provided for herein.

(b)     The Liquidator shall liquidate the assets of the Company, and apply and distribute the proceeds of such liquidation, in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

(i)     the payment to the creditors of the Company, including Members, in order of priority provided by law;

(ii)     to establish or add to such reserves as the Liquidator may deem necessary or appropriate; and

(iii)     to the Members in accordance with <u>Section 6.3</u>.

(c)     In liquidation, the Company may distribute the assets of the Company to Members in cash, ratably in kind, or in any combination thereof. Each distribution in kind of property shall be made based upon the fair market value of such property.

25

ARTICLE XIII
INDEMNIFICATION

13.1  Company Indemnity.  The Company shall indemnify and hold harmless each Member and Manager (an "Indemnitee") from and against any and all losses, costs, damages, liabilities, attorneys' fees, judgments, fines, settlements, penalties and other expenses actually and reasonably incurred by the Indemnitee (the "Indemnified Expenses") in connection with any and all claims, demands, actions, suits, or proceedings, whether civil or criminal, administrative or investigative, in which the Indemnitee is involved or threatened to be involved, as a party or otherwise (the "Indemnified Claims"), by reason of the fact that the Indemnitee is or was a Member, Manager or employee of the Company, provided that (i) the Indemnitee's conduct did not constitute willful misconduct; (ii) the action is not based upon a breach of this Agreement including, without limitation, a breach by a Manager of any of the provisions of Section 6.10; (iii) the Indemnitee acted in good faith and in a manner which the Indemnitee reasonably believed to be in, or not opposed to, the best interests of the Company and within the scope of such Indemnitee's authority; and (iv) with respect to a criminal action or proceeding, the Indemnitee had no reasonable cause to believe his or her conduct was unlawful. Further, no indemnification shall be had which is not permitted under the Act.  To be eligible for indemnity hereunder, the Indemnitee shall have given notice to the Company on a reasonably prompt basis of the existence, nature, and scope of the Indemnified Claims and Indemnified Expenses as soon as the Indemnitee became aware thereof.

13.2  Advancement of Indemnified Expenses.  Indemnified Expenses incurred by an Indemnitee may, from time to time, be advanced by the Company prior to the final disposition of an Indemnified Claim upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such Indemnified Expenses if it shall ultimately be determined that such Person is not entitled to be indemnified as authorized in this Article.

13.3  Non-Exclusivity.  The indemnification provided by this Article shall be in addition to any other rights to which the Indemnitee may be entitled under any agreement, vote of the Members, as a matter of law or equity, or otherwise, and shall inure to the benefit of the successors, assignees, heirs, personal representatives and administrators of the Indemnitee.

13.4  Insurance.  The Company may purchase and maintain insurance, at the Company's expense, on behalf of any Indemnitees against any liability that may be asserted against or expense that may be incurred by an Indemnitee in connection with the activities of the Company, regardless of whether the Company would have the power to indemnify such Indemnitee against such liability under the provisions of this Agreement.

ARTICLE XIV
GENERAL PROVISIONS

14.1  Notifications.  Any notice, demand, consent, election, offer, approval, request, or other communication (collectively a "notice") required or permitted under this Agreement must be in writing or by electronic transmission and either delivered personally, be sent by certified or registered mail, postage prepaid, return receipt requested or be sent by facsimile, electronic transmission or recognized overnight courier.  Any notice to be given hereunder by the

26

Company shall be given by a Manager. A notice must be addressed to a Member at the Member's last known address on the records of the Company. A notice to the Company must be addressed to the Company's principal office. A notice delivered personally will be deemed given upon actual receipt. A notice that is sent by mail will be deemed given three (3) business days after it is mailed. A notice that is sent by facsimile, electronic transmission or recognized overnight courier will be deemed given one (1) business day after the facsimile or electronic transmission is sent or delivery to the courier, as the case may be. Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees. For purposes of this Section 13.1, "electronic transmission" means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved, and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such recipient through an automated process.

14.2  Specific Performance. The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach, or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

14.3  Complete Agreement. This Agreement constitutes the complete and exclusive statement of the agreement among the Members. It supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty. Neither this Agreement nor the Articles of Organization may be amended except upon a Required Vote.

14.4  Applicable Law. All questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Nevada.

14.5  Section Titles. The headings herein are inserted as a matter of convenience only, and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

14.6  Binding Provisions. This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and permitted assigns.

14.7  Jurisdiction and Venue. Any suit involving any dispute or matter arising under this Agreement may only be brought in the United States District Court for the District of Nevada. All Members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

27

14.8  Terms. Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the identity of the Person may in the context require.

14.9  Separability of Provisions. Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

14.10  Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

14.11  Estoppel Certificate. Each Member shall, within ten (10) days after written request by any Member or Manager, deliver to the requesting Person a certificate stating, to the Member's knowledge, that: (i) this Agreement is in full force and effect; (ii) this Agreement has not been modified except by any instrument or instruments identified in the certificate; and (iii) there is no default hereunder by the requesting Person, or if there is a default, the nature and extent thereof.

14.12  No Partnership Intended for Nontax Purposes. The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership under either the Nevada Revised Uniform Partnership Act or the Nevada Revised Uniform Limited Partnership Act. The Members do not intend to be partners to one another, or partners to any third party. To the extent any Member, by word or action, represents to another person that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal liability by reason of such representation. No statement or action of any Member that occurred prior to the formation of the Company shall be construed to constitute the formation of a partnership of that Member with any other Member or any third party.  The Company shall, to the extent permissible, elect to be treated as a partnership for federal, state and local income tax purposes, and each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment and no Member shall take any action inconsistent with such treatment.  The Company shall not be deemed a partnership or joint venture for any other purpose.

14.13  Approvals and Consents Must be in Writing.  Whenever this Agreement calls for the consent or approval of any Member or Members, such consent or approval shall be effective only if it is in writing and signed by or on behalf of the Member who is granting such consent or approval.

14.14  Representations and Warranties by the Members.

14.14.1        Representations and Warranties regarding Securities Laws Matters. By such Member's execution hereof, each Member hereby represents and warrants to the Company and each of the other Members that:

28

(a)    such Member recognizes that the Company is only presently being organized and has no financial or operating history and such Member understands the nature of the investment such Member is making;

(b)    such Member has such knowledge and experience in financial and business matters that such Member is capable of evaluating the merits and risks of this investment, and has so evaluated such merits and risks;

(c)    such Member understands that he must bear the economic risks of the investment for an indefinite period of time because the Membership Interests have not been registered under the Securities Act of 1933, as amended, or the securities laws of any state and, therefore, cannot be resold unless subsequently registered under such laws, or unless an exemption from such registration is available;

14.14.2    such Member will not resell, Transfer or distribute the securities being purchased hereunder without registration under the Securities Act of 1933, as amended, and under the securities laws of any state or other applicable jurisdiction or unless an exemption from said laws is available; and

(a)    such Member is purchasing Membership Interests for investment and for such Member's own account only and not with a view to resell or otherwise distribute the Membership Interests being purchased hereunder, and such Member does not intend to divide his participation with others or to resell or otherwise dispose of all or any part of such securities.

14.14.3    Representations and Warranties regarding Legal Representation. By such Member's execution hereof, each Member (other than Express Services, Inc. or any Affiliate of Express Services, Inc. that owns a Membership Interest) severally acknowledges and represents that Express Services, Inc.'s counsel, Hartzog Conger Cason & Neville, prepared this Agreement on behalf of and in the course of its representation of Express Services, Inc. Further, each Member (other than Express Services, Inc. or any Affiliate of Express Services, Inc. that owns a Membership Interest) severally acknowledges and represents that:

(a)    Such Member has been advised that a conflict of interest may exist between his interests and those of Express Services, Inc. and the other Members;

(b)    such Member has been advised by Express Services, Inc.'s counsel to seek the advice of independent legal counsel;

(c)    such Member has had the opportunity to seek the advice of independent counsel;

(d)    such Member has been advised by Express Services, Inc.'s counsel that this Agreement may have tax consequences;

(e)    such Member has received no representations from Express Services, Inc.'s counsel concerning the tax consequences of this Agreement; and

29

(f)    such Member has been advised by Express Services, Inc.'s counsel to seek the advice of independent tax counsel.

14.15 <u>Prevailing Party Attorney's Fees and Expenses</u>.  In an action brought by any party hereto to enforce the obligations of any party hereto, the prevailing party shall be entitled to such party's reasonable attorney's fees, court costs and expenses in such action.

14.16 <u>Business Days</u>.  If any time period for giving notice or taking action under this Agreement expires on a day which is a Saturday, Sunday or holiday in the state in which the Company's chief executive office is located, the time period shall be automatically extended to the business day immediately following such Saturday, Sunday or holiday.

14.17 <u>No Strict Construction</u>.  The parties to this Agreement have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties to this Agreement, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

IN WITNESS WHEREOF, the Members and Managers have signed below.

MEMBERS:

SNIPES MANAGEMENT COMPANY, LLC

By: _____
    A.  Marshall Snipes, Manager


INTEGRATED STRATEGIES, LLC

By: _____
    Scott L. Harris, Manager


EXPRESS HALLMARK HOLDING CO. LLC

By: _____
    Thomas N. Richards, Manager

_____
Barry D. Bloom

_____
Thomas N. Richards

30

BETA MANAGER:

_____
Thomas N. Richards

DELTA MANAGERS:

_____
A. Marshall Snipes

_____
Barry D. Bloom

31

# **EXHIBIT C**

# UNIT REDEMPTION AGREEMENT

**THIS UNIT REDEMPTION AGREEMENT** ("Agreement") is made and entered into effective as of the 31st day of October, 2007, by and between Claimetrics Management, LLC (formerly Hallmark National, LLC), a Nevada limited liability company ("Company"), Barry D. Bloom ("Member"), and Integrated Services, L.L.C., an Oklahoma limited liability company, Snipes Management Company, L.L.C., an Oklahoma limited liability company, Express Hallmark Holding Co., LLC, an Oklahoma limited liability company, and Thomas N. Richards, an individual (collectively referred to herein as the "Remaining Members").

## WITNESSETH

**WHEREAS,** the Member is the owner of twenty thousand (20,000) Delta units of the outstanding capital interest in the Company (the "Units"), the value of which includes, but is not limited to, goodwill and intangible value associated with, among other things, confidential information of the Company and relationships with the Company's customers, contractors, vendors and other Members;

**WHEREAS,** the Remaining Members own the remaining issued and outstanding capital interests in the Company;

**WHEREAS,** the Member hereby desires to sell, transfer and convey to Company and Company hereby desires to purchase and redeem from the Member all of the Member's right, title and interest in and to Member's Units including, but not limited to, any and all goodwill and intangible value associated with, among other things, confidential information of the Company and relationships with the Company's customers, contractors, vendors and other Members, under the terms and conditions set forth hereinbelow; and

**WHEREAS,** the Member, the Company and the Remaining Members desire to evidence the promises, covenants, terms, provisions and conditions upon which such purchase and redemption of the Member's Units will be consummated by this binding Agreement.

**NOW, THEREFORE,** for and in consideration of the premises and the mutual covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties **HEREBY AGREE AS FOLLOWS:**

1.      **Recitals.**  The explanatory statements set forth above are incorporated by reference in, and made a part of this Agreement, as though fully rewritten here at length.

2.      **Consent to Redemption.**  The Member, the Company and the Remaining Members do hereby consent to the redemption of the Ownership Interest (defined in Section 3 below) by the Company from the Member as set forth under the terms and conditions of this Agreement.

Barry D. Bloom
Unit Redemption Agreement

3.    **Purchase and Sale of Ownership Interest**.  Upon the execution and delivery of this Agreement and subject to the terms, provisions and conditions hereof, the Member shall sell, assign, transfer and deliver to the Company and the Company shall purchase, acquire and receive from the Member, all right, title and interest in and to the Member's twenty thousand (20,000) Delta units of the issued and outstanding capital interest in the Company, which were issued by the Company to the Member, including, but not limited to, any and all goodwill and intangible value associated with, among other things, confidential information of the Company and relationships with the Company's customers, contractors, vendors and other Members, all of which such interests described in this Section 3 shall be collectively referred to herein as the "Ownership Interest."

4.    **Purchase Price**.  The total consideration that the Company shall be obligated to pay at closing to the Member for the Ownership Interest shall be Zero and No/100ths Dollars ($0.00) (the "Consideration").

5.    **Representations and Warranties by Member**.  The Member represents and warrants to the Company and the Remaining Members as follows:

5.1    **Execution, Delivery and Performance of Agreement; Authority**.  The execution, delivery and performance of this Agreement by the Member will not conflict with any provision of any mortgage, lease, license, agreement, law, rule or regulation or any order, judgment or decree to which the Member is a party or by which the Member may be bound.  The Member has the full power and authority to enter into this Agreement and to carry out the transactions contemplated hereby, and this Agreement constitutes a valid and binding obligation of the Member, which is enforceable against the Member in accordance with its terms.

5.2    **Litigation**.  There is no claim, legal action, suit, arbitration, governmental investigation or other legal or administrative proceeding, nor any order, decree or judgment in progress, pending or in effect, or to the knowledge of the Member, threatened against or relating to the Member: (i) in any way challenging or affecting the Member's right or authority to execute, deliver and perform under or to consummate the transaction contemplated by this Agreement or (ii) in which a final adverse decision would either adversely affect the ability of the Member to perform under this Agreement or declare this Agreement to be invalid or unenforceable as to the Member in whole or part.

6.    **Representations and Warranties by Company and Remaining Members.**  Company and the Remaining Members represent and warrant to the Member as follows:

6.1    **Organization, Standing and Qualification of Company**.  Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Nevada.  Company has all requisite corporate power and authority and is entitled to carry on its business as now being conducted and to own, lease or operate its properties as now conducted.

6.2    **Execution, Delivery and Performance of Agreement; Authority**.  The execution, delivery and performance of this Agreement by the Company and the Remaining Members and the related agreements referred to herein will not conflict with any provision of the articles of

organization of the Company or the operating agreement of the Company or any mortgage, lease, license, agreement, law, rule or regulation or any order, judgment or decree to which the Company is a party or the Remaining Members are a party or by which the Company or the Remaining Members may be bound. The Company and the Remaining Members have the full power and authority to enter into this Agreement and to carry out the transactions contemplated hereby, and this Agreement constitutes a valid and binding obligation of the Company and the Remaining Members, which is enforceable against the Company and the Remaining Members in accordance with its terms.

6.3     **Litigation**. There is no claim, legal action, suit, arbitration, governmental investigation or other legal or administrative proceeding, nor any order, decree or judgment in progress, pending or in effect, or to the knowledge of the Company or the Remaining Members, threatened against or relating to the Company or the Remaining Members: (i) in any way challenging or affecting the right or authority of the Company or the Remaining Members to execute, deliver  and perform under or to consummate the transaction contemplated by this Agreement, or (ii) in which a final adverse decision would either adversely affect the ability of the Company or the Remaining Members to perform under this Agreement or declare this Agreement to be invalid or unenforceable as to the Company or the Remaining Members in whole or part.

7.     **Closing**.

7.1     **Closing Date**. The closing of the transaction contemplated by this Agreement shall take place on such date and at such time which is mutually agreeable to the parties hereto (the "Closing").

7.2     **Member's Conditions to Close**.  Member's obligation to close the transaction contemplated hereby shall be subject to the complete satisfaction and fulfillment of all of the following conditions precedent, any or all of which may be waived in whole or part by the Member (but no such waiver of any such condition precedent shall be or constitute a waiver of any covenant, promise, agreement, representation or warranty made by the Company or the Remaining Members in this Agreement):

7.2.1     All representations and warranties made by the Company and the Remaining Members in this Agreement shall be complete and accurate at and as of the Closing; and

7.2.2     All covenants, promises and agreements made by the Company and the Remaining Members in this Agreement and all other actions required to be performed or complied with by the Company and the Remaining Members under this Agreement prior to or at Closing shall have been fully performed or complied with by the Company and the Remaining Members.

7.3     **Company and Remaining Members Conditions to Close**. The Company's or the Remaining Members' obligation to close the transactions contemplated hereby shall be subject  to the complete satisfaction and fulfillment of all of the following conditions precedent, any or all of which may be waived in whole or part by the Company or the Remaining Members (but no such waiver of any such condition precedent shall be or constitute a waiver of any covenant, promise, agreement, representation or warranty made by the Member in this Agreement):

7.3.1    All representations and warranties made by the Member in this Agreement shall be complete and accurate at and as of the Closing; and

7.3.2    All covenants, promises and agreements made by the Member in this Agreement and all other actions required to be performed or complied with by the Member under this Agreement prior to or at Closing shall have been fully performed or complied with by the Member.

8.    **Assignment**. At Closing, the Member will assign, transfer and deliver to the Company all of the Member's right, title and interest in and to the Ownership Interest. Such transfer shall be evidenced by the execution of an Assignment of Ownership Interest.

9.    **Return of Corporate Property**. Except as otherwise provided in this Agreement, the Member hereby agrees to return any and all property owned by the Company and in the possession of the Member to the Company at Closing.

10.    **Additional Documents**. The Member, the Company and the Remaining Members shall execute and deliver any and all additional documents that may be necessary to effectuate the intent and purpose of this Agreement.

11.    **Waiver**. No waiver of any breach or default hereunder shall be considered valid unless in writing and signed by the party giving such waiver, and no such waiver shall be deemed a waiver of any subsequent breach or default of the same or similar nature.

12.    **Binding Effect**. This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and their respective heirs, successors and assigns.

13.    **Captions**. The section headings contained herein are for the purposes of convenience only and are not intended to define or limit the contents of such sections.

14.    **Governing Law**. This Agreement and all amendments thereof shall be governed by and construed in accordance with the laws of the State of Oklahoma applicable to contracts made and to be performed therein, without reference to its conflict of laws provisions.

15.    **Amendments**. The terms and provisions of this Agreement may not be modified or amended except by an instrument in writing executed by the Member, the Company and the Remaining Members.

16.    **Time of the Essence**. Time shall be of the essence with respect to performance by the parties of their respective obligations under this Agreement.

17.    **Counterparts**. This Agreement may be executed in one or more counterparts, all of which taken together shall be deemed one original.

18.    **Notices**. Any and all notices or other communications required or permitted to be given under any of the provisions of this Agreement shall be in writing and shall be deemed to have been

duly given when personally delivered or mailed by first class registered mail, return receipt requested, or professional overnight delivery service, or by facsimile confirmed by one of the foregoing methods, addressed to the parties at the addresses set forth below, or at such other address as any party may specify by notice to all other parties given as aforesaid:

**If to Claimetrics:**

Claimetrics Management, LLC
8516 N.W. Expressway
Oklahoma City, Oklahoma 73162
Attn: Thomas N. Richards

**With Copy to:**

DeBee Gilchrist, A Professional Corporation
100 N. Broadway Avenue, Suite 1500
Oklahoma City, Oklahoma 73102
Attn: H. Edward DeBee, Esq.

**If to Member:**

Barry D. Bloom
385 Chestnut Street
San Carlos, California 94070

**If to the Remaining Members:**

Integrated Services, L.L.C.
7250 NW Expressway
Oklahoma City, Oklahoma 73132
Attn: Scott Harris

Snipes Management Company, LLC
7250 N.W. Expressway
Oklahoma City, Oklahoma 73132
Attn: A. Marshall Snipes

Express Hallmark Holding Co., LLC
8516 N.W. Expressway
Oklahoma City, Oklahoma 73162
Attn: Thomas N. Richards

Thomas N. Richards

8516 N.W. Expressway
Oklahoma City, Oklahoma 73162

David B. Gillogly
8516 Northwest Expressway
Oklahoma City, Oklahoma 73162

19.    **Integrated Agreement**.  This Agreement and any exhibits attached hereto constitute the entire and final expression of the agreement of the parties hereto with respect to such terms as are included herein and is a complete and inclusive statement of the terms of such agreement. No party hereto shall be bound by any verbal representations altering the terms of this Agreement or any exhibits attached hereto.

        **IN WITNESS WHEREOF**, the parties hereto have executed this Agreement effective as of the day first above written.

                          **Member**


                          _____
                           Barry D. Bloom, an individual


                          **Company**

                          Claimetrics Management, LLC,
                          a Nevada limited liability company


                          By:_____
                              Thomas N. Richards, Manager


                          By: _____
                              A. Marshall Snipes, Manager

**Remaining Members**

Integrated Services, L.L.C.,
a Oklahoma limited liability company


By: _____
      Scott Harris, Manager


Snipes Management Company, LLC,
an Oklahoma limited liability company


By: _____
      A. Marshall Snipes, Manager


Express Hallmark Holding Co., LLC,
an Oklahoma limited liability company


By: _____
      Thomas N. Richards, Manager


_____
Thomas N. Richards, an individual